# CHARLESTON

## Toothman v. Courtney.

### Submitted June 11, 1906.    Decided April 12, 1907.

| 62  | 167 |
| 65  | 244 |
| d65 | 432 |

| 62 | 167 |
| 66 | 639 |

1. MINES AND MINERALS— *Conveyances—Oil and Gas Leases.*

   A deed, granting, by the use of appropriate technical terms, all the oil and gas under a tract of land, together with the exclusive right to enter thereon at all times for the purposes of drilling and operating for oil and gas, but limiting the estate to a term of seven years and as much longer as oil or gas may be found thereon in paying quantities, stipulating for the payment of commutation money for delay in drilling, denominating it rental, and providing for the delivery into pipe-lines, for the grantor, of one-eighth of all the oil produced and saved from the premises, and also for payment of a yearly rentel for every gas well from which gas is transported and used off of the premises, does not pass the title to the oil and gas in place. In legal effect, it is a mining lease and the title to the oil and gas in place remains in the grantor. (p. 168.)

2. CONTRACTS—CONSTRUCTION—*Deeds—General Rules—Intention of Parties.*

   Technical words in a deed, contract or other instrument, will be limited and controlled in their effect by the intention of the parties, gathered from the instrument, considered, as a whole, in the light of the nature of its subject matter and the purpose for which it was executed. (p. 171.)

3. TAXATION—*Assessment—Mode—Undivided Interest in Land.*

   An undivided interest in land, or mineral underlying land, cannot properly be entered and taxed on the land book; and a deed founded upon a sale of such undivided interest, for non-payment of taxes, is irregular and will be set aside. (p. 177.)

4. SAME—*Curative Statutes.*

    Such defect in the assessment, sale and deed is not cured by any provision of section 25 of chapter 31 of the Code. (p. 184.)

5. SAME—*Tax Title—Action to Set Aside Deed—Conditions Precedent.*

    A bill to set aside a tax-deed in such case must tender the purchase money and taxes subsequently paid, as a condition precedent to the setting aside of the deed, or aver the willingness and readiness of the plaintiff to pay the same. A decree which fails to secure to the purchaser such reimbursement is erroneous. (p. 184.)

6. APPEAL—*Disposition of Cause—Remand to Trial Court—Leave to Amend.*

    On reversing a decree, for insufficiency of the bill, in a cause in which a good case is disclosed by the evidence, this Court will remand the cause with leave to the plaintiff to amend his bill. (p. 185.)

Appeal from Circuit Court, Monongalia County.

Action by Daniel L. Toothman against David H. Courtney and others. From a decree in favor of plaintiff, defendant Courtney appeals.

*Reversed.    Remanded.*

Cox & BAKER, for appellant.

W. S. MEREDITH and W. S. CONAWAY, for appellee.

POFFENBARGER, JUDGE:

Daniel L. Toothman obtained, by a decree of the circuit court of Monongalia county, the setting aside of a deed, made by the clerk of the county court of said county, conveying to David H. Courtney an undivided one-sixteenth of the oil and gas in a tract of 143 acres of land, lying in said county, pursuant to a sale thereof, as delinquent land, made by the sheriff. The land seems to be rich in oil production, carried on by the South Penn Oil Company, and the decree, in addition to setting aside said deed, requires said company to pay one-sixteenth of the oil produced by it to Toothman instead of Courtney. Believing the tax-deed valid and his title to the royalty good, Courtney has appealed.

As the decree stands upon the theory of invalidity in the assessment, non-taxability and non-salableness of the Tooth-

man interest as land, it is necessary to disclose here the transactions relating to the title,    Owning the tract of land in fee, Toothman, on the 6th day of August, 1889, executed to one C. J. Ford, an instrument, the true character of which is a matter of controversy between counsel for the respective parties, but which designates itself "Oil Lease." In express terms, it grants to Ford "all the oil and gas in and under" the land, "to have and to hold for the term of seven years" from the date thereof "and as much longer as oil or gas is found in paying quantities thereon." Further provisions, bearing upon the question to be determined, read as follows:

"The above grant is made upon the following terms:

1st.   Second party agrees to drill a well upon said premises within ten months from this date, or thereafter pay to first party a yearly rental of $144.00 dollars for further delay until such well is drilled, such rental when due, shall be deposited in First Nat. Bank of Fairmont, State of West Va., should second part fail to make such deposit or pay to first part, on *there* premises or at present residence of first part the said rental, then this instrument shall be null and void and neither party hereto shall be held to any accrued liability or to any damages, or to any stipulations or conditions herein contained.

2nd.   Should oil be found in paying quantities upon the premises, second part agrees to deliver to first part in the pipe line with which he may connect the well or wells, the one-eighth part of all the oil produced and saved from the premises.

3rd.   Should gas be found, second part agrees to pay to first part three hundred dollars yearly, payable quarterly, on demand for each and every well from which gas is transported or used off the premises so long as the same is so transported or used.

\*  .\*  \*  \*  \*  \*

7th.   Second part may at any time remove all his property and reconvey the premises hereby granted and thereupon this instrument shall be null and void."

Ford assigned the interest acquired by this paper, along with others, to the South Penn Oil Company by an instru-

ment, entitled "Assignment of Leases," and dated April 23rd, 1891. By a paper, called "Deed for Oil Royalty," dated May 1, 1894, Toothman conveyed, to Joseph McDermott, " the 1-16 one sixteenth part of all the oil and gas in and under" the tract of land, in consideration of $500.00, then paid. There were then twelve producing wells on the land, and the following clause of the deed is said to have been intended to apply to additional wells, if any should be drilled: " Party of the second part agrees to pay to first party fifty dollars for each and every well drilled on above premises." By a deed dated April 2, 1897, Toothman conveyed to Luther B. Wilson, the tract of land, together with a slight interest in the oil and gas. He retained practically one-sixteenth interest, half of the one-eighth originally provided for, by a reservation clause couched in the following terms: " Party of the first part reserves all the oil rental, there are twelve wells drilled, and if any wells be drilled after the twelve wells is drilled, the second party is to have the sixty-fourth part of the oil."

For the year 1900, an entry was made in the land books, charging to Toothman an undivided one-sixteenth of the oil and gas in the tract of land for taxation. The taxes were extended on the same, and being unpaid, that interest was sold by the sheriff in January, 1903, as delinquent land, to Nicholas C. Vandervort, who assigned his purchase to Courtney by uniting with the clerk in the deed made to him.

No irregularities in the sale or deed, such as are usually relied upon in cases of this kind, are set up in the bill. There is an allegation of fraud, but it is unsustained by any evidence adduced. It does not appear that the entire tax on the land in which the oil and gas are was charged to any person or persons and paid under other entries in the land book, so as to make the charge against Toothman, in any sense, a double assessment on the interest owned by him. If it did, the deed would be void on that ground.

The crucial tests of the propriety of the decree, therefore, are, first, whether Toothman owned any interest in the land; second, whether, if so, there was a valid assessment; and

third, whether the defect in the assessment, if any, invalidates the sale and deed.

We are unable to adopt the view, vigorously pressed upon us in argument by counsel for the appellee, that the instrument, executed by Toothman to Ford and assigned by the latter to the South Penn Oil Company, passed the fee simple title to the oil and gas. In the granting part thereof, it uses terms technically efficacious and appropriate for the accomplishment of such a result, and if they were not limited and restrained by other language and provisions, the instrument could not be held to be a lease. Though words of absolute conveyance are used, the *habendum* limits them. The estate granted is a term of seven years from the date of the deed and as much longer as oil and gas may be found in paying quantities. By the discovery and production of oil and gas or one of them, the specific term of seven years may be greatly prolonged, but, tested by the letter of the deed and probably by its spirit as well, the term does not cease to be a mere term by the prolongation thereof. However long the term, an estate for years is not a freehold. Moreover, this deed implies that so much of the corpus as is conditionally granted is to be severed and removed from the land, and the implication is re-enforced by conditions annexed to the grant which compel the grantee to take the oil and gas. The instrument does not contemplate a continuing and interminable ownership of the gas and oil in place, but rather a limited right of possession and use of the land for the severance, conversion into personal property, and removal, of certain portions thereof.

Though the instrument, construed by this Court in *State v. South Penn Oil Co.*, 42 W. Va. 80, differed very materially in its terms from this one, the principles enunciated in that case seem to be fairly applicable here and to sustain the views just expressed as embodying the correct construction of the deed. This Court there declared as follows: "A privilege or liberty or license to search and explore the land for oil or for other minerals, coupled with a grant to dig and remove them, and convert them to the grantee's own use, if in fee or for life, creates an incorporeal freehold right in the real estate, which may be assessed to the grantee separately from the land or its surface, and, if the minerals be

found and produced, creates a freehold interest, which should be assessed separately on the land books, under the act of February 27, 1891 (chapter 36) entitled 'An act to provide for the reassessment of .the value of all real estate within this state.' But such privilege, liberty, or license, and such interest, if limited to a term of years, are not held and owned as the whole or a part of a freehold ownership, within the meaning of the act, and should not be separately assessed to the mining licenses or lessee on such land books." To the same general effect see *Harvey Coal Co.* v. *Dillon*, 59 W. Va. 605, in which the doctrine of *State* v. *South Penn Oil Co.* is reiterated.

It is not necessary, however, to decide that the time limitation upon the grant is conclusive of the character of the estate created, and we do not do so. The very great weight to which it is entitled is aided by that clause of the instrument which imposed upon the grantee, as a condition to the continuance of the estate, the payment, at the expiration of three months, of "a yearly rental of $144.00" for delay in drilling a well, and the delivery into the pipe-line for the benefit of the grantor, of one-eighth of all the oil that should be produced from the land, and the payment of $300.00 yearly from every well from which gas should be transported and used off the premises. These provisions are strongly indicative of a lease. Found in the same instrument in which terms, technically appropriate to the conveyance of an absolute estate, are found, they furnish reason to doubt whether the parties intended that the technical terms used should operate according to their legal import. Courts not infrequently restrain the operation of such terms so as to effectuate the clear intent of the parties, deducible from the instrument as a whole, viewed in the light of its subject matter and the situation of the parties. In *Jackson* v. *Myers*, 3 Johns. (N. Y.) 388, 394, Chief Justice Kent said: "The intent, when apparent and not repugnant to any rule of law, will control technical terms, for the intent, and not the words, is the essence of every agreement. In the exposition of deeds, the construction must be upon the view and comparison of the whole instrument, and with an endeavor to give every part of it meaning and effect." See Devlin on Deeds, section 837, and the long list of cases there cited. When-

ever a technical term is used by the grantor to express an idea different from its technical signification the intention will be effectuated by construction.  *Railroad Co. v. Beal*, 47 Cal. 151.  The context may qualify words of technical limitation, so as to make them conform to the grantor's intention.  *Criswell* v. *Crumbling*, 107 Pa. St. 408.  See 13 Cyc. 605, 606.  The circumstances connected with the transaction and the situation of the parties may be considered in arriving at their intent.  Devlin on Deeds, section 859.

In construing contracts and deeds relating to oil and gas in place and creating reciprocal rights in respect to it, courts invariably recognize an implied obligation or covenant on the part of the grantee or lessee in favor of the grantor or lessor. Among these is an implied covenant on the part of the lessee to develop the property with reasonable diligence so that the lessor may come into possession of the benefits which it was intended he should receive.  Otherwise, the contract would be one-sided, leaving the lessor at the mercy of the lessee and subject to any arbitrary action he might see fit to take.  In *Parish Fork Oil Co.* v. *Bridgewater Gas Co.*, 51 W. Va. 583, we said, concerning oil leases:  "They are executed by the lessor in the hope and with an expressed or implied condition that the land shall be developed and oil produced.  When production takes place, the lease is mutually beneficial.  The royalty, which it is stipulated in all these leases that the land owner shall receive, is generally the moving cause of the execution of the lease.  If there is one principle that is asserted in *Steelsmith* v. *Gartlan* more vigorously, and with more emphasis, than any other, it is that the lessee shall proceed to make the lease profitable to both parties and that he shall not be permitted to tie up the land." See *Petroleum Co.* v. *Coal Co.*, 89 Tenn. 381; *Conrad* v. *Morehead*, 89 N. C. 31; *Munroe* v. *Armstrong*, 96 Pa. St. 307; *Huggins* v. *Daly*, 69 Fed. Rep. 613; *Ray* v. *Gas Co.*, 138 Pa. St. 576.  The peculiar nature of the subject matter of this instrument, as reflected by the decisions just referred to, viewed in the light of the difference in consequences and results between a lease and an absolute conveyance upon condition subsequent, and the customary method of dealing with it, are to be considered in connection with the terms

used, in seeking the intention of the parties. The instances in which absolute conveyances of oil and gas are made upon conditions, requiring development for the mutual benefit of grantor and grantee, are extremely rare, and it is to be presumed that the parties did not intend such a conveyance, unless the terms of the instrument so clearly indicate it that a contrary intention cannot reasonably be deduced therefrom.

The decision in *State* v. *Low*, 46 W. Va. 451, relied upon by counsel for the appellee as sustaining their construction of this deed, deals with a paper radically different from this in many respects. It conveyed all the oil and gas in a certain tract of land, for and in consideration of the sum of eight dollars, on the sole condition of the payment, by the grantee to the grantor, within ninety days after the completion of a well on the premises under a lease to which the conveyance was subject, of the sum of $800.00. The penalty was failure of title. There was no provision for the payment of any royalty or rental, nor any covenant, express or implied, for the development of the property. The grantor parted, conditionally with his entire interest in the oil and gas, and for all time, not for a mere term of years. It was agreed, among other things, that, if any royalty should be produced under the lease then on the land, it should go to the grantee.

Our conclusion is that the instrument under consideration is a lease, vesting in Ford a right of exploration and production on the usual terms of one-eighth of the oil to the lessor, as royalty, and seven-eighths to the lessee, as a "working interest," which passed by assignment to the South Penn Oil Company, leaving the fee simple title to all the oil and gas in the lessor.

Of this, he conveyed to Joseph H. McDermott one-sixteenth, retaining the title to fifteen-sixteenths. By the deed to Wilson he conveyed the land in fee, reserving to himself "all the oil rental." What right or title remained in him by virtue of this reservation is a question not free from difficulty. We all agree that he still had a fee simple estate in the oil and gas, but we differ as to the extent of that interest. My associates, except JUDGE MILLER, are inclined to the view that he retained an undivided one-sixteenth. I am

unable to reach the conclusion that he retained that, otherwise than by holding that he retained all the oil and gas, less what he had conveyed to McDermott. I do not see how it can be said that he retained any interest in the gas and oil *eo nomine.* A rental issuing out of the land is not the land itself, nor is it any part of the land. Rents and profits are the mere usufruct of the land. There may be an estate in them, an unlimited right of enjoyment, but it is an 'incorporeal hereditament. A reservation in a deed or lease of a rent for a term of years is none the less an intangible incorporeal right. In the deed to Wilson, Toothman reserved no land, no oil, no gas, by name, but only the oil rental which means the royalty. He reserved all the oil rental, thereby retaining in himself the beneficial use of all the oil in the land, less what he had conveyed to McDermott. The only provision of the deed in favor of Wilson, relating to the oil, is the grant of one-sixty-fourth thereof, to become effective after the drilling of more than twelve wells on the land.

Though he did not reserve by name the oil in place, or any part of it, his reservation of all the rental or royalty to be derived from it, compels the court to hold, by construction of the instrument, that it vests in him the title to that thing, the beneficial use whereof has been reserved, namely, the oil in place. Jarman on Wills, m. p. 741, says: "A devise of the rents and profits or of the income of land passes the land itself both at law and in equity; a rule, it is said, founded on the feudal law, according to which the whole beneficial interest in the land consisted in the right to take the rents and profits. And since the act 1 Vict. c. 26, such a devise carries the fee simple; but before that act it carried no more than an estate for life unless words of inheritance were added. But where a testator, seised or possessed of a reversion in fee or for years, to which rent was incident, devised or bequeathed his 'ground rent,' not only the rent, but the reversion would pass; as he was considered, when speaking of the ground rent, to mean by that term all the reversionary interest, of which the rent was the immediate fruit." This principle was applied by the supreme court of Pennsylvania in *Weakland* v. *Cunningham*, 7 Atl. Rep. 148, in which it was held as follows: "The fol-

lowing reservation in a deed: 'Excepting the profits of one-half of all the stone coal, and of all other kinds of mineral, which may be discovered at any time hereafter,'—is a reservation of the *corpus* of all such coal and mineral in place."

Not doubting the soundness of this legal proposition or its applicability in the construction of deeds, as well as wills, I unhesitatingly make use of it here, because it will operate justly, fully effectuating the intention of the parties. The oil was already under lease and the royalty, or oil rental, is all it can ever yield to its owner. That reserved to Toothman, he has the entire beneficial use of the oil, the equivalent of the ownership of it in place. Wilson can never derive a dollar from it, unless the conditional grant of a one-sixty-fourth interest should take effect. If there had been no lease on the land, I would be of the same opinion, for a reservation of all possible benefit of the oil is tantamount to a reservation of the *corpus* thereof. It matters not that, in such case, there would be a presumption that one-eighth is the royalty contemplated, it being the usual royalty, for that presumption is inseparable from the further one that the remaining seven-eighths goes with the royalty as a means of making it available, or realizing it, for where one-eighth is the royalty the residue never benefits the land-owner otherwise than by enabling him to get the one-eighth. It is given to the lessee as compensation for producing and delivering the royalty. The two presumptions are locked in indissoluble companionship. They unite in pressing the view that a grant, exception or reservation of the one-eighth royalty carries with it, as a satellite of the royalty, the seven-eighths "working interest." That, afterwards, it happens, that a larger royalty may be obtained by the grantee, signifies nothing. He is at perfect liberty to make a better bargain for operation of the territory than it was supposed he could make. After events and mere surmises are not to be considered. The intention at the time of the execution of the deed is the test. JUDGE MILLER concurs in the views I have here expressed.

But, whether these conclusions be sound or not, we agree that Toothman had title to at least one-sixteenth of the oil in place and that he did not have title to the whole of

it, for he had, by his deed, conveyed one-sixteenth to Mc-
Dermott.

The tax-deed stands upon the assessment of an undivided
interest in land.    Will such an assessment sustain a sale and
conveyance of land for non-payment of taxes?    Our statute
does not contemplate such an assessment.    Section 36
of chapter 29 of the Code of 1899, reading as follows,
requires land to be assessed either as tracts or town lots, ac-
cording to the fact:    ''The clerk of the county court shall
make out the land book, including all extensions, in such
form as the auditor may prescribe, showing for each magis-
terial district in one table the tracts of land and in a separate
table the town lots, arranged in the alphabetical order of the
names of their owners."    Accordant with said provision, and
rendering proper departure therefrom impossible, section 37
of said chapter, imposes the following duties:    '' In the table
of the tracts of land the clerk shall enter each tract separ-
ately, and shall set forth, in as many separate columns as
may be necessary, the name of the person who, by himself
or his tenant, has the freehold in his possession; the nature of
his estate, whether in fee or for life; the number of acres as
near as may be in the tract; the name of the tract, if it has a
name; a description of it as far as practicable, with reference
to the water-courses, mountains or other places on or near
which it lies; the distance and bearing; as near as may be,
from the court house; the value of the land'per acre, in-
cluding buildings; the value of the whole tract and build-
ings; the sum included in the value on account of buildings;
the amount of taxes assessed on each tract for state, state
school, county, free school, building and other district pur-
poses, in separate columns, at the rate assessed for each of
such purposes."

The person in whose name real estate shall be taxed is
prescribed in section 40 of said chapter, as follows:    "As to
real property the person who, by himself or his tenant, has
the freehold in his possession, whether in fee or for life,
shall be deemed the owner for the purpose of taxation.    A
person who has made a mortgage or deed of trust to se-
cure a debt or liability shall be deemed the owner uniil the
mortgagee or trustee takes possession, after which such mort-
gagee or trustee shall be deemed the owner."

That undivided interests are not to be separately assessed is made apparent by the provision relating to taxation of lands of decedents, reading, in part, as follows: "When the owner dies intestate, his undivided real estate may be listed to his heirs without designating any of them by name until they shall have given notice to the clerk of the county court of the division of the same, the names of the several heirs, and the parcels allotted to each; and each heir shall be liable for the whole tax assessed upon such land while it is so listed; but when he pays the same he may recover of the others their proper proportion of the amount so paid and the proportion thereof for which such other or others are liable shall be a lien on the interests owned by him or them in such lands; and such liens, when the amount so paid exceeds twenty dollars in all, may be enforced in a court of equity." Section 26, chapter 29, Code. Separate assessment of certain interests is authorized by section 25 of said chapter, but they are not undivided interests. It says: "When a tract or lot of land becomes the property of different owners, in several parcels, or one person becomes the owner of the surface, and another of the minerals under the same, or of the timber alone on said land, the assessor shall divide the value at which the whole had before been assessed, among the different owners, having regard to the value of each interest compared with that of the whole, and enter the same on the copy of the land book in his possession, or upon a statement appended thereto." This applies where the freehold estate in the minerals or timber has been severed, in ownership, by deed or otherwise, from the freehold in the land. Under it, coal is assessable by the acre; oil or gas, as the oil or gas in so many acres; and timber as the timber on so many acres; each as an entire thing, or stratum of the land. Nothing in it suggests a shadow of authority for assessing an undivided interest in one of these things, nor can there be any reason for doing so, which would not be equally applicable to such interests in other portions of the land. However potent such reasons may be, the legislature has refused to be governed by them, and the mode of assessment is a subject of its discretionary power, with which courts cannot interfere.

It has been suggested that section 4 of chapter 12 of the

Acts of 1899, providing for the re-assessment of the value of all the real estate in this state, authorizes and will sustain the assessment of undivided interests in minerals. How far that act may be deemed to have amended the general law, it having been a special act, providing for a single valuation, might be an interesting question, if it were necessary to make the inquiry. It contains no repealing clause and appears not to have been designed to work any radical or fundamental alteration of the general laws, relating to taxation, and its character and purpose must not be overlooked in seeking its meaning. The clause therein relied upon as authorizing this assessment reads as follows: "And when any mineral, mineral water, oil, gas or coal privileges or interests, are held by a party or parties, or any company or association, exclusive of the surface, the same shall be assessed separately, to such party, or parties, company or association." That mere licenses or leases for coal, oil or gas never were, and are not now, taxable as land under this or any other statute, has been solemnly decided by this Court in *Harvey Coal Co.* v. *Dillon*, 59 W. Va. 605, (53 S. E. 928,) notwithstanding the very general terms used. The word "interest" is still more indefinite and a qualified meaning is necessarily given to it by the context. That limits it to an interest held exclusive of the surface, thereby impliedly requiring separation in title of something from the surface. Separation from the surface can only apply to something which had connection therewith. Surface is a tangible thing. The "interest" to be held separately necessarily means, therefore, the coal, oil, gas, and mineral water, not an undivided interest in that interest. Under this act, partial separation from the surface is not enough. The thing to be separately assessed must be held exclusive of the surface. That means total separation of something from the surface. Acts *in pari materia* must be construed together. This act and section 25 of chapter 29 of the Code were operative at the same time and related to the same thing. Said section 25 had already authorized separate assessments of minerals and timber when separately owned. As there was some confusion in the minds of assessors as to what were minerals, the re-assessment act of 1899, descended into an enumeration of several species thereof, naming such as were

frequently owned separately ' from the surface. These things the act called mineral "interests" plainly meaning the minerals themselves, not estates in them, interests in the titles thereto, or shares therein. It is not pretended that section 25 of the general law contemplates separate assessment of undivided interests in minerals and there is a presumption against any intent to modify it by the special re-assessment act, which must be overcome with plain language. The reassessment act related to valuation only. Nothing else is included in its title. Anything in the act, not fairly within its title, is a nullity. Who should pay tax on land is wholly foreign to the matter of valuing land for taxation. Acts should be so construed as to make them valid and effective, not unconstitutional and void. In merely enumerating the species of minerals, separate taxation of which had been authorized by the general statute, the valuation act added nothing, changed nothing. It merely interpreted the general statute and made it plain and clear for the guidance of the assessors acting under the valuing act. "Interests" in the clause of the statute, above quoted, necessarily means mineral water, oil, gas and coal. It is qualified by the terms "mineral, mineral water, oil, gas or coal," used as adjectives. "Privileges and interests" are the assessable subjects and they are mineral subjects. The complete owner of the coal in a tract of land is the owner of an interest in it and it is a mineral interest. Such description does not fit ownership of an undivided half or other fraction of the coal. In describing such ownership, using interest for coal, it would be necessary to say an undivided interest in a mineral interest. My construction makes interest stand for mineral. The other construction would make it stand for mineral also and then go further and qualify mineral by the word "undivided." This, in my opinion, is unwarranted by the letter of the clause, and is certainly in the very teeth of the general law, and therefore, violative of another rule of construction.

If the terms in which the law-making body has expressed itself were, in any sense, doubtful, respecting this matter, which I do not admit, there would be very strong reasons for resolving that doubt against taxation of undivided interests,

and their potency on the question, whether the departure is material, is apparent. It would often bring almost infinitesimal interests in land under clouds of title and into litigation, thereby clogging and obstructing alienation, withholding land from the markets, impeding its improvement and retarding the development and prosperity of the state. Such a system of taxation would be burdensome to the owner and unwise as a matter of state policy, viewed in this light alone. The observation of Mr. Justice Sawyer, of the Supreme Court of California in *Biddleman* v. *Brooks*, 28 Cal. 72, on setting aside a tax-deed, predicated on the assessment of a part of a tract of land, held in undivided ownership, as the supposed equivalent, in acreage, of the undivided interest of one of the co-tenants, apply here with almost equal force. He said: "The assessor is nowhere authorized to arbitrarily divide up lots in strips to suit his caprice, and assess such several portions separately. If he may divide up a lot of well known boundaries into strips twenty feet wide, he may divide it into strips of one foot in width, or even smaller dimensions, and assess each separately, and thus render it not only greatly inconvenient and oppressive to the owner, but almost impossible for him to ascertain whether his taxes have all been paid or not. The law undoubtedly contemplates that each lot of well-known dimensions and boundaries shall be assessed as one lot. In this instance, there was a lot of the ordinary dimensions—the smallest of the lots as originally officially surveyed and platted in that part of the city—which had not been subdivided by the owner. It was enclosed by a single fence, separating it distinctly from all other lands and had a dwelling-house and outbuildings upon it, the whole openly and notoriously occupied by a single lot or messuage by the defendant's tenant and his family. Yet it was arbitrarily sliced up into at least three parts, and each separately assessed as a distinct lot, the larger portion—more than half—being assessed to the real owner, the defendant, and the other two parcels to unknown owners. Such an assessment of a tract of land constituting one well-known lot, and actually occupied as such—if it would necessarily have such an effect, would be very likely to mislead the owner, and result, as in this instance, in a sale of his property. The owner calls to pay his taxes. A

list of all the taxes against him is furnished. Upon looking it over he finds a lot in a certain locality taxed to him, and without scrutinizing the boundaries very closely, he naturally concludes that the whole lot is assessed to him, as it should be, pays his taxes, and rests in security, till several years afterwards finds that a small strip has been, in fact, assessed to unknown owners, and without his knowledge or fault, sold."

Under our system of taxation, land itself, and not a mere estate or interest in it, is a primary subject of taxation, and the remedy for enforcement of payment is directly against the land as well as its owners. The statute creates a lien upon all land for the taxes thereon, which may be enforced by a suit in equity. It also provides for sale of the land, for non-payment of the taxes thereon, and, for failure to cause land to be charged with the taxes it ought to pay, for a period of five years, the title is forfeited and becomes vested in the state, by constitutional and statutory provisions. These provisions deal with the *corpus* and complete title to the land. In so far as they are constitutional, they are of great dignity, and may be considered as founded upon most weighty reasons of public policy. Such of them as are statutory must be deemed to be in execution of the constitutional plan of taxation, and highly impregnated with its spirit. Good reason for adopting the plan is found in the consequences which would flow from general use of the departure now under consideration. If fifty persons, owning equal undivided shares of a tract of land, were separately charged with their respective interests on the land book, the state's lien for taxes would be severed into fifty parts, and fifty suits might be maintained, and possibly would be necessary, for the collection of the taxes on the tract. It would require fifty separate and distinct sheriff's sales for delinquency, and, if made to the state, for want of private bidders, she would be compelled to make fifty purchases instead of one, undergoing multiplied risks of complication, delay and loss, and the state would find herself, in thousands of instances, in a relation of co-tenancy with private persons, in the ownership of land, not only as the results of such sales, but also of forfeiture for non-entry. It would not only bring, upon the state, embarrassment in the en-

forcement of her constitutional rights and powers, but, upon the people, interminable confusion of land titles, contrary to the spirit of the constitution, which, by its system of forfeiture and transfer, endeavors to prevent and eradicate uncertainty of such titles.

It may well be assumed that taxation of land by undivided interests would be fraught with inconvenience and injury to the land owner as well as to the public, though the nature and extent thereof is not so apparent. First, the law prescribes a different mode, and so impliedly forbids it, all of which is presumed to rest upon sound reason, and as the state's ability to sustain such burdens in the forms of expense and delay as are necessary to just, equitable and fair dealing with the tax-payer, is ample, the legislature may be deemed to have considered his best interests, as well as those of the public, in adopting the scheme of assessment and collection of taxes. Secondly, the assessment of the entire tract or lot against some person or persons indicated by statute is almost universal among the states of this country. In some states the assessment is made against the owner or occupant, in others, against the owner and in others against the person or persons having the freehold in possession. In very few instances have assessments been prescribed otherwise than by tracts and lots. Blackwell, Tax Titles, section 256 *et seq*; Black, Tax Titles, sections 104 & 105; Cooley, Tax. 730-733. "In a majority of the states the rule prescribed by the statutes is that lands and other real estate shall be assessed *as such,* irrespective of the separate estates that individuals may have in them." Cooley, Tax. 739.

However, inasmuch as every foot and particle of any given tract of land is made liable, by the constitution and statutes, for all the taxes charged and chargeable thereon, and it is beyond the power of the assessor, collector or owner to evade the claim and the remedies of the state, by the assessment or collectiion of only part of such taxes, it is not difficult to perceive that the owner of an undivided interest in it is subjected to great peril by the attempt to assess it by undivided interests. In such case, if one undivided interest should become delinquent, it would be the duty of the auditor to certify either the entire tract for sale, or none of it; and, if any undivided interest should be omitted for a period

of five successive years, the title to the entire tract would become forfeited and vest in the state. Forfeiture and sale can be prevented only by payment of all the taxes. *Smith, Trustee,* v. *Tharp et al,* 17 W. Va. 221; *Frum* v. *Fox,* 58 W. Va. 334, 338. This must be so else the state may be deprived of part of her security by the mere ignorance, negligence or malfeasances of her officers; for, in so dividing up an assessable subject, they release liens and split up remedies into mere shreds without warrant of law; and if it be so, a land owner will ordinarily have great difficulty in determining when and how the taxes on his land have been discharged. Instead of one assessment and payment to look after, he may have a dozen or fifty. Again, he is presumed to know the law, and to have assumed, in this case, either that the taxes on his interest were included in some other legal assessment, or that it had not been charged at all, for this assessment being invalid, he is presumed to have had knowledge of its invalidity and to have refrained from paying under the assessment for that reason. The departure from the requirement of the statute is, therefore, plainly manifest, and, as it appears in the record of the proceedings, it must be assumed that, but for it, the interest sold would have been redeemed. *McCallister* v. *Cottrells,* 24 W. Va. 173; *Williamson* v. *Russell,* 18 W. Va. 612; *Simpson* v. *Edmiston,* 24 W. Va. 675; *Batton* v. *McClain,* 50 W. Va. 121.

A great many defects and irregularities in tax sales and tax-deeds are cured by ssction 25 of chapter 31 of the Code, but this seems clearly not to be one of them. It is not an irregularity, error or mistake in the delinquent list, the return thereof, the affidavit thereto, the recordation of such list or affidavit, the manner of laying off any real estate sold, the plat, the description or report. It is not an instance of the failure of any officer to do or perform any act or duty required to be done or performed by him after sale is made, or of his illegal or defective performance, or attempt at performance, of any such act or duty. Nor is it within any of the other defects or irregularities specifically cured by said section.

Affirmance of the decree would be the inevitable result of these conclusions, but for a fatal defect in the bill, which can

be cured by amendment.  It does not tender the tax sale purchase money and taxes subsequently paid, in obedience to the statutory requirement in such case, nor does it aver the plaintiff's readiness and willingness to reimburse the purchaser, nor does the decree in any way secure to the defendant his right of reimbursement.  For this reason, the decree will have to be reversed and the cause remanded with leave to the plaintiff to amend his bill in this respect.  See *Batton* v. *McCluin*, 50 W. Va. 121; *Mosser v. Moore*, 56 W. Va. 478.  The court below, deeming the assessment, sale and deed fraudulent and void, held reimbursement not necessary.  We do not concur in this view.  It was an irregular and defective assessment and sale, not cured by the statute.

Agreeably to the conclusions above stated, the decree will be reversed, the demurrer sustained and the cause remanded with leave to the plaintiff to amend his bill.

*Reversed.    Remanded.*