JAMES C. BEARD

*v.*

HON. ROBERT M. WORRELL, *Judge, etc.*

*and*

MARGARET O. BEARD

(No. 13517)

Decided December 20, 1974.

*Lynch, Mann & Knapp, Jack A. Mann, Norman Knapp* for relator.

*John S. Hrko* for respondents.

NEELY, JUSTICE:

A rule to show cause was issued in this original action in prohibition to determine whether there is any reason to disturb the long-standing rule in the domestic relations law of this State that a party against whom a divorce has been granted is not entitled to alimony. As the Court finds that *W. Va. Code*, 48-2-15 [1953] under which the case of *Cecil v. Knapp*, 143 W. Va. 896, 105 S.E.2d 569 (1958) was decided has not been changed in any way relevant to this question by the 1969 amendment to that section, the Court holds that a party

against whom a divorce is awarded is not entitled to alimony and the writ of prohibition is awarded.

On January 19, 1970 petitioner, James C. Beard, was granted a divorce from his wife, the respondent, Margaret O. Beard, by the Circuit Court of Wyoming County in an action in which Margaret Beard originally filed an answer and a counterclaim for divorce. However, at the time of the hearing, Mrs. Beard appeared by counsel and withdrew her answer and counterclaim and the action was heard as an uncontested suit. By an agreement between James Beard and Margaret Beard dated January 12, 1970 the parties entered into a property settlement which provided in paragraph 4:

> "First Party shall pay to Second party as permanent alimony the sum of $600.00 per month until her death or remarriage, the first such payment to be made February 1, 1970 for the month of February and like payments to be made in advance on the first day of every month thereafter:"

It appears from uncontroverted deposition and affidavit evidence submitted to this Court that Mrs. Beard had a hysterical fear of courts and judges.[1] The respondent,

---

[1] The following testimony was given by Mr. D. Grove Moler, Attorney at Law of Mullens, West Virginia, who represented Mr. James C. Beard in the original divorce action:

"Q. Do you know whether or not Mrs. Beard has a fear of courtrooms?

A. Mrs. Beard, from my observation as a layman and in my contacts with her, does have a hysterical fear of going into court or before a judge or even around a courthouse.

Q. Mr. Moler, would you say she was of that frame of mind around January 19, 1970?

A. In my experience with Mrs. Beard, she has always been of that frame of mind on any day that that question came up whether it was an issue in her case or anything else. I might say that I am not a physician, of course, but as much as a layman can describe a person as a schizophrenic, I believe she falls in that classification. When I was Prosecuting Attorney, some men were defrauding her by forgery and I had a very difficult time to even get her to come to my office because of

Mrs. Beard, asserts that the withdrawal of her answer and counterclaim was done as a matter of convenience predicated upon an acceptable property settlement agreement and her psychological inability to appear in court as a party plaintiff.

By order dated January 19, 1970 the circuit court awarded a divorce to Mr. Beard and specifically included the finding. "The plaintiff has proved grounds for a divorce from the bonds of matrimony with defendant." The court awarded the physical custody of the parties' infant daughter, Jane Ann Beard, to Mrs. Beard and specifically awarded $600 per month alimony to Mrs. Beard by the following paragraph of the order:

> "2. James C. Beard shall pay to Margaret O. Beard alimony in the monthly amount of $600.00, beginning with the month of February, 1970, until said Margaret O. Beard shall re-marry, but shall not be required to pay any additional sum to defendant for the support and maintenance of Jane Ann Beard while residing with defendant. All other provisions pertaining to alimony and support as set forth in the aforesaid agreement of the parties shall be deemed in full force and effect between the parties the same as if fully set forth herein."

Some months after the initial decree was entered, Mr. Beard petitioned the court for the custody of his daughter and the court changed the custody in his favor.

---

her fear of a courthouse. I could not get her before the grand jury, and on another occasion she was summoned for jury duty, and this was back when she and Mr. Beard were living rather amicably together. I came upon her in the hallway of the Wyoming General Hospital where she was employed about ten-thirty or eleven o'clock in the morning, and she asked me to get her off from jury duty and I told her I didn't think I could, that the judge took care of that himself and that she would enjoy it and I tried to encourage her and she went into a hysterical fit there in the hallway, when it was weeks away from jury time, because of her fear of going to court."

After paying Mrs. Beard for several months, Mr. Beard stopped paying and in 1973 petitioned the Circuit Court of Wyoming County to declare the January 19, 1970 decree void on the same grounds asserted in this action in prohibition, i.e. that a prevailing party in a divorce action is not liable for alimony. The court denied Mr. Beard's petition and thereafter Mrs. Beard brought an action in contempt in which Mr. Beard was adjudged guilty of contempt for being in arrears in his alimony payments in the amount of $6,200. The circuit court granted Mr. Beard a stay of execution of its judgment order to allow him time to test the ruling by this action in prohibition and this proceeding was brought to prohibit the enforcement of the order finding him in contempt.

I

The respondent, Mrs. Beard, asserts as a defense to this action in prohibition the equitable doctrine of "clean hands." The Court recognizes that it would appear that the course of conduct surrounding this divorce and subsequent litigation demonstrates unfair dealing on the part of Mr. Beard, as he agreed to pay the sum of $600 a month to his wife by contract and now seeks to avoid an obligation into which he entered voluntarily. The doctrine of "clean hands," however, is not available to Mrs. Beard because an action in prohibition is not a proceeding with antecedents in equity. Prohibition is an extraordinary remedy which has traditionally been used in cases of this nature where a circuit court has exceeded its jurisdiction. *State ex rel. Cecil v. Knapp,* 143 W. Va. 896, 105 S.E.2d 569 (1958); *Hammond v. Worrell,* 144 W. Va. 83, 106 S.E.2d 521 (1958).

While the respondent does not cite the cases in her brief, *Davis v. Prunty,* 114 W. Va. 285, 171 S.E. 644 (1933) and *Lyons v. Steele,* 113 W. Va. 652, 169 S.E. 481 (1933) would appear to hold that equitable defenses are available in actions in prohibition.. However, the matter was clarified in the later case of *Harmon v. Spurlock,* 121 W. Va. 633, 5 S.E.2d 797 (1939) which states the correct rule

that prohibition is a legal remedy. The *Lyons* case contained some broad dicta which was unnecessary to the holding which read as follows at 113 W. Va. 656, 169 S.E. 483:

> "... We hold, accordingly, that courts in West Virginia are not bound to allow the writ (under *Code* 1931, 53-1-1) merely because the applicant shows a clear technical right to prohibition; but they should deny the writ (under section 8) whenever he comes not with clean hands, as in the instant case."

*Davis* contained similar unfortunate dicta in this regard.

Although both *Lyons* and *Davis* were correctly decided on their facts, it will be demonstrated by the following historical discussion that it is incorrect to permit equitable defenses to an action in prohibition.

Historically the writ of prohibition was used to control encroachment on the king's jurisdiction by competing systems of courts. England in the reign of Henry II (1154-1189) was a feudal domain in which the king's courts were struggling to establish a national system of law (i.e., a law "common" to all parts of England) in the face of competition from traditional local centers of judicial power. II W. Holdsworth, *A History of English Law* 193 (4th Ed. 1936). Among the strongest competitors for judicial power were the manorial courts of local magnates who held courts for their vassals in furtherance of their authority as landlords, and the ecclesiastical courts which claimed jurisdiction with regard to all matters touching faith and morals. The claims of the ecclesiastical courts presented a monumental problem for the king's jurisdiction because in the middle ages almost everything touched faith and morals, including testamentary disposition of personal property, obligations involving an oath, and all matters concerning the family. I F. Pollock & F. Maitland, *History of English Law* 124-135 (2d Ed. 1898—Reissued with new introduction and select bibliography by S.F.C. Milsom, 1968).

Resistance from the manorial courts did not present a major political problem, but rather a problem more akin to the resistance which a modern leader experiences in attempting to innovate in the face of an entrenched bureaucracy. (*See*, S.F.C. Milsom's Introduction to the 1968 Edition of Pollock and Maitland, *History of English Law*, Cambridge University Press.)

However, the struggle against the courts Christian was another matter, involving as it did a general power struggle throughout Europe between temporal and ecclesiastical authorities.[2] The struggle between Thomas Becket and Henry II was basically a struggle concerning the proper domain of ecclesiastical jurisdiction. I Holdsworth, *supra*, p. 179; II Holdsworth, *supra*, p. 329; I Pollock & Maitland, *supra*, p. 198; II Pollock & Maitland, *supra*, 447-457. In 1164 the *Constitutions of Clarendon* attempted to resolve the conflict by establishing the respective areas of jurisdiction of the temporal and ecclesiastical courts and by providing that royal justices would decide which tribunal had jurisdiction. Thus long before the emergence of equity as a separate branch of jurisprudence[3] writs of prohibition issued from the king's courts for the purpose of controlling jurisdiction.

---

[2] This struggle throughout Christendom is no more dramatically caricatured than in the scene of Henry IV of Germany (1050-1106), Holy Roman Emperor, standing barefoot in the snow outside the gates of Canossa seeking absolution from Pope Gregory VII in 1077 because he had attempted what Henry II of England would achieve ninety years later (partially through the liberal use of the writ of prohibition) namely the legal supremacy of the temporal over the ecclesiastical power. *See*: V *The Cambridge Medieval History*, Chapter. 2 (1926); for a selection of cases where ecclesiastical courts were restricted by prohibition, *see also*: I Reeves, *History of English Law* 141, 153 and Coke, *2nd Institute*, 598-628.

[3] Courts today generally ascribe the latter part of the 14th century as the period during which equity first appeared as a jurisprudential system separate and distinct from the common law or royal justice system. Blackstone gives a more specific date, that is, the end of the reign of Edward III, who died in 1377. "But when, about the end of the reign of Edward III, uses of land were introduced, and, though totally discountenanced by the courts of common law,

At an early date Bracton (?-1268) established the underlying purpose of the writ of prohibition as a protection of the Sovereign and not as a protection of the parties. Bracton specifically said:

> "The royal court is zealous in maintaining its jurisdiction; the plea rolls are covered with prohibitions directed against ecclesiastical judges; and it is held that this is a matter affecting the king's crown and dignity." I Pollock & Maitland, *supra*, p. 251.

Bracton's justification for a writ of prohibition remains in force today. While in England the writ protected the jurisdiction of the king and his royal courts, in the United States by analogy it protects and preserves the rule of law. While a usurpation of jurisdiction may achieve a humane or even desired result, as quite possibly has been achieved by the Circuit Court of Wyoming County in the case at bar, usurpation is inconsistent with the rule of law and cannot be tolerated in a well ordered system of justice. This proposition is reflected by the fact that writs of prohibition in West Virginia are always correctly brought in the name of the State at the relation of a party, although in modern practice failure to comply with this formality has not usually defeated petitioner's right.

Only after years of existence as a common law remedy and after equity developed into a separate branch of English jurisprudence, did the courts of chancery begin to issue writs of prohibition in extraordinary circumstances, but this did not change the purpose of the writ which always was to protect jurisdictional divisions. Further, it appears that the writ was not exhaustively used by chancery. In 1803 Blackstone described the writ as follows:

> "A prohibition is a writ issuing properly only out of the king's bench, being the king's preroga-

---

were considered as fiduciary deposits and binding in conscience by the clergy, the separate jurisdiction of the chancery as a court of equity began to be established;" Blackstone, *Commentaries*, Book III, p. 52

tive writ but for the furtherance of justice, it may now also be had in some cases out of the court of chancery, common pleas, or exchequer; directed to the judge and parties of a suit in any inferior court, commanding them to cease from the prosecution thereof, upon suggestion that either the cause originally, or some collateral matter arising therein, does not belong to that jurisdiction, but to the cognizance of some other court." Blackstone, *Commentaries*, Bk. III, p. 112.

It is only with a view to the historical purposes of a writ of prohibition that we may return to the case of *Lyons v. Steele, supra,* for a critical analysis of what occurred. In *Lyons,* Steele paid Lyons $200 for a tract of land and received a deed. Then a third party, one Cornell, brought suit in chancery against both Lyons and Steele claiming title to the tract of land grounded in a prior executory contract under which Cornell had tendered partial payment. The circuit court found in favor of Cornell and nullified the deed from Lyons to Steele, conditioned upon Cornell paying the balance of what he owed Steele. Cornell complied by depositing the balance with the clerk of the court, but Lyons failed to execute a deed, and so a special commissioner was appointed for that purpose.

Next Steele sued Lyons in a justice of the peace court for the $200 he had paid Lyons for the land and Lyons entered an affidavit alleging that a question of title to land would be brought into question, thus *prima facie* denying the justice of the peace jurisdiction. Steele countered with an affidavit setting forth the conclusion that title to land would not be called into question, but failed to allege facts in support of his conclusion that no issue of title would be tried. The justice heard the case and awarded Steele his $200 whereupon Lyons brought an action in prohibition in the circuit court where a writ was awarded. Steele appealed the award of the writ to this Court.

This Court found that the counter-affidavit filed by Steele did not sufficiently deny the truth of the facts alleged by Lyons and that the justice lacked *prima facie* jurisdiction in the matter. However, the Court further found that Lyons' affidavit misstated the facts and that title to land would not be called into question. This Court decided that Lyons had deliberately withheld information regarding the title to the land in his affidavit and had made the misleading statement that Cornell "did not pay or offer to pay the sum of money to the defendants within ten days from the date said decree was entered or any part thereof."

Accordingly what this Court did was adjudicate the question of jurisdiction in this Court, and found as a matter of fact that the justice had jurisdiction. The Court refused to affirm the grant of the prohibition when the only ground was a pleading error because jurisdiction *in fact* existed. This had nothing to do with equitable principles, but rather comports with ancient usage under which the question of actual jurisdiction was often litigated in an action in prohibition in a court of competent jurisdiction, and if jurisdiction on the part of the inferior tribunal were found to exist, the case was remanded to the inferior tribunal.

As early as the beginning of the Nineteenth Century Blackstone recognized the procedure as follows:

"... And, even in ordinary cases, the writ of prohibition is not absolutely final and conclusive. For, though the ground be a proper one in point of *law*, for granting the prohibition, yet, if the *fact* that gave rise to it be afterwards falsified, the cause shall be remanded to the prior jurisdiction. If, for instance, a custom be pleaded in the spiritual court; a prohibition ought to go, because that court has no authority to try it: but, if the fact of such a custom be brought to a competent trial, and be there found false, a writ of *consultation* will be granted. For this purpose the party prohibited may appear to the prohibition, and take a declaration, (which must always

pursue the suggestion) and so plead to issue upon it; denying the contempt, and traversing the custom upon which the prohibition was grounded: and, if that issue be found for the defendant, he shall then have a writ of *consultation*."[4] Blackstone, *Commentaries*, Book III, pp. 113, 114.

Thus Blackstone recognized that questions of jurisdiction can be completely adjudicated upon an action in prohibition, and where the lower court is found to be acting within its jurisdiction, the action may be remanded. Although in *Lyons* this Court articulated some vague dicta that equitable principles applied, the Court cited but scant authority from foreign American jurisdictions for the proposition. Accordingly this Court would observe that *Lyons v. Steele* was correctly decided because the justice of the peace court had jurisdiction as there was *in fact* no question regarding title, but this Court assigned an incorrect and unnecessary reason for its holding.

The same critical analysis applies to the case of *Davis v. Prunty*, 114 W. Va. 285, 171 S.E. 644 (1933) where this Court off-handedly commented that the writ of prohibition is governed by equitable principles. In *Davis* a wife brought an action for non-support in Doddridge County and the husband pleaded a former award of temporary alimony to the wife by the Domestic Relations Court of Cabell County. The Doddridge County court ordered that he pay support and the husband brought an action in prohibition on the grounds that jurisdiction of the question was exclusively vested in the Domestic Relations Court of Cabell County. This Court found that as the husband had failed to plead or prove that he had actually made payments under the Cabell County award, the

---

[4] In former English practice the grant of a "writ of consultation" was the equivalent of the modern denial of a writ of prohibition. It permitted the action to be returned to the court in which it was originally prosecuted before the award of the rule. The "writ of consultation" was so named because upon deliberation and *consultation* the judges found the prohibition inappropriate.

Doddridge County court had jurisdiction to entertain an action for non-support, as failure to pay support created a separate cause of action, criminal in nature, and the State was entitled to protect itself from the requirement of supporting dependents. Accordingly the issue of jurisdiction was actually tried in the action in prohibition and the lower court was found to have jurisdiction. The language describing prohibition as being governed by equitable principles was unfortunate surplusage.

After both *Lyons* and *Davis* had been decided the correct rule was succinctly stated in *Harmon v. Spurlock*, 121 W. Va. 633, 5 S.E.2d 797 (1939) where Judge Riley said: "Though, in some respects, a writ of prohibition resembles the remedy of injunction, it is classed among legal remedies." Unfortunately, Judge Riley then cited both *Lyons* and *Davis* as authority for that proposition, which is a unique method of over-ruling cases.

## II

In the leading case of *Cecil v. Knapp, supra,* this Court squarely held that *W. Va. Code,* 48-2-15 [1953] did not confer jurisdiction upon a court to award alimony against a prevailing party in a divorce action. The Court has examined the 1969 amendment to *W. Va. Code,* 48-2-15 [1953] and finds that there is nothing in that amendment which indicates an intention on the part of the Legislature to change the law of this State in this regard, except in *W. Va. Code,* 48-2-4(a)(7) and (a)(8) [1969] dealing with divorces to be granted for voluntary separation or permanent insanity.[5]

--------

[5] (a) A divorce may be ordered:

(1) For adultery; or

(2) When either of the parties subsequent to the marriage has, in or out of this State, been convicted for the commission of a crime which is a felony, and such conviction has become final; or

(3) To the party abandoned, when either party wilfully abandons or deserts the other for one year; or

(4) For cruel or inhuman treatment, or reasonable apprehension of bodily hurt, and false accusation of adultery or homosexuality by either party against the other shall be deemed cruel treatment within the meaning of this subdivision; cruel and inhuman treat-

*W. Va. Code*, 48-2-4 [1969] sets forth the grounds upon which a divorce may be granted and in subsections (a)(1) through (a)(6) where the traditional concept of fault is applicable, the Legislature is silent on the subject of

ment shall also be deemed to exist when the treatment by one spouse of another, or the conduct thereof, is such as to destroy or tend to destroy the mental or physical well-being, happiness and welfare of the other and render continued cohabitation unsafe or unendurable and under no circumstances whatever shall it be necessary to allege or prove acts of physical violence in order to establish cruel and inhuman treatment as a ground for divorce; or

(5) For habitual drunkenness of either party subsequent to the marriage; or

(6) For the addiction of either party, subsequent to the marriage, to the habitual use of any narcotic drug or drugs or dangerous drug or drugs as those terms are defined in this Code; or

(7) Where the parties have lived separate and apart in separate places of abode without any cohabitation and without interruption for two years, whether such separation was the voluntary act of one of the parties or by the mutual consent of the parties; and a plea of res adjudicata or of recrimination with respect to any other provisons of this section shall not be a bar to either party's obtaining a divorce on this ground. If alimony is sought under the provisions of section fifteen [§ 48-2-15] of this article, the court may inquire into the question of who is the party at fault and may award such alimony according to the right of the matter and such determination shall not affect the right of either party to obtain a divorce on this ground; or

(8) For permanent and incurable insanity. No divorce shall be granted on the ground of insanity unless such permanently incurable insane person shall have been confined in a mental hospital or other similar institution for a period of not less than three consecutive years next preceding the filing of the complaint; nor shall a divorce be granted on these grounds unless the court shall have heard competent medical testimony that such insanity is permanently incurable. The court granting a divorce under this subdivision may in its discretion order support and maintenance for such permanently incurable insane party by the other. Where an insane person, within the meaning of this section, is a plaintiff in an action for divorce or annulment, the defendant shall not enter a plea of recrimination which is based upon the insanity of the plaintiff.

(b) It shall not be necessary to allege the facts constituting the ground or grounds relied upon, and a complaint or counter complaint shall be sufficient if any one of the grounds is alleged in the language of such ground as set forth in subsection (a) of this section.

awarding alimony, implying a recognition of the rule of *Cecil v. Knapp, supra,* which prohibits an award of alimony against a prevailing party. However, in subsections (a)(7) and (a)(8) dealing with divorces to be granted upon the grounds of voluntary separation and permanent and incurable insanity, the *Code* now permits a party to prevail regardless of fault, but then establishes an ancillary proceeding for determining questions of fault and maintenance. For example, in subsection (a)(7) concerning divorce based on voluntary separation, the statute says:

> "If alimony is sought under the provisions of section fifteen [§48-2-15] of this article, the court may inquire into the question of who is the party at fault and may award such alimony according to the right of the matter and such determination shall not affect the right of either party to obtain a divorce on this ground."

Accordingly under (a)(7) fault is to be the criterion for an award of alimony. In the case of a divorce granted for permanent and incurable insanity as set forth in subsection (a)(8) specific provision is made for the support and maintenance of an insane party because the Legislature has apparently adopted the modern view that insanity does not involve moral fault.

Since the 1969 amendment to *W. Va. Code,* 48-2-4 it is theoretically possible for a person both to obtain a divorce and be the party at fault under the provision for granting a divorce to either party after two years of voluntary separation. Similarly a party seeking a divorce for permanent insanity may also receive a divorce and be required to pay alimony. However, while under these grounds a party granted a divorce may be required to pay alimony, the grant of alimony must be supported by the pleadings.

In the case at bar the respondent withdrew her answer and counterclaim to petitioner's action for divorce, and accordingly the award of alimony was unsupported

by her pleading. *W. Va. Code*, 48-2-10 [1969] provides that in divorce proceedings:

"Such action shall be instituted and conducted as other actions, except as provided in this article. . . . All pleadings shall be verified by the party in whose name they are filed; but the complaint shall not be taken for confessed, and whether the defendant answers or not, the case shall be tried and heard independently of the admissions of either party in the pleadings or otherwise; and no judgment order shall be granted on the uncorroborated testimony of the parties or either of them. . . ."

Although the *West Virginia Rules of Civil Procedure* have greatly liberalized the technical requirements of pleading, and while Rule 15, *R.C.P* permits the amendment of pleadings when appropriate to conform to the evidence, there is no mandate in Rule 15, *R.C.P* which would cause this Court to reverse its holding in syllabus point 4 of *Bennett v. Bennett*, 137 W. Va. 179, 70 S.E.2d 894 (1952) which held: "Where the jurisdiction of a court to grant a divorce depends upon the existence of certain facts, such facts must be pleaded, and, if not pleaded, the court has no right or power to proceed or act in the cause."

By analogy, under the new grounds established by *W. Va. Code*, 48-2-4 (a)(7) and (a)(8) any award of alimony must be grounded in a counterclaim demanding such relief, otherwise the plaintiff would be denied notice of the claim made against him.

The well established common law rule with regard to fault as a condition for the award of alimony and its justification was presented in *Cecil v. Knapp, supra,* where this Court quoted *Harris v. Harris*, 31 Gratt. 13, which said:

"Alimony had its origin in the legal obligation of the husband, incident to the marriage state, to maintain his wife in a manner suited to his means and social position, and although it is her

right, she may by her misconduct forfeit it; and where she is the offender, she cannot have alimony on a divorce decreed in favor of the husband. So long as he has committed no breach of marital duty, he is under no obligation to provide her a separate maintenance, for she cannot claim it on the ground of her own misconduct."

As the Legislature has not expressly or impliedly changed the rule, it must and should remain in full force and effect. *W. Va. Const.*, Art. VIII, § 21.

The law of marriage and divorce offers adequate opportunity for judicial caprice without adding to the law's uncertainty; a person who would enter into a contract of marriage places all of his or her worldly goods within the control of a local circuit judge in the event that an action for divorce is brought by his or her spouse. Although a circuit court must exercise discretion in a sound manner, wide latitude is given to the trial judge, and within the tests for sound discretion a trial judge has more than ample opportunity to serve up a healthy helping of his own particular philosophy of life to the parties in a divorce action. Accordingly, while the result may be somewhat harsh in this case, it is in the interest of sound public policy to preserve the predictability of the law by maintaining the firm rule against alimony in favor of a guilty party. Without this definite demarcation as the absolute limit to a trial judge's discretion an appellate court would have no criterion for testing an award of alimony and a spouse's liability under the marriage contract would be without meaningful definition.

### III

Fortunately for those readers who are skeptical about the theoretical advantages of predictability gained through the inflexible application of substantive and procedural rules regardless of the human suffering involved, the respondent, Mrs. Beard, is not without her remedy. Alimony is a somewhat unique form of court awarded monetary payment as it is enforceable not only

by the normal procedures for the enforcement of judgments generally but also by the contempt remedy. Alimony is a judicially decreed payment which is completely separable from a binding property settlement agreement. This has been the law at least since the case of *Miller v. Miller*, 114 W. Va. 600, 172 S.E. 893 (1934). In *Miller* a wife had entered into a separation agreement which provided that the husband pay her the sum of $150 per month, and which further provided that "this contract shall be submitted to the court and the court requested to adopt its provisions in full settlement of alimony of the party of the second part and the property rights between both parties." The court made reference to the contract and decreed that the husband pay the wife the sum of $150 per month as alimony. On appeal from a subsequent order reducing the award this Court held that the circuit court had jurisdiction to reduce the amount of alimony when the husband suffered a financial reversal and distinguished the wife's right under the contract from her rights under the divorce decree which merged the contract right. The Court said at 114 W. Va. 602, 172 S.E. 894:

> "What we have said refers of course only to alimony and is not to be interpreted as having any bearing upon the contractual rights of the respondent, if any she has, under the said agreement between her and her husband, dated February 12, 1931. In our decree proper reservation will be made to her."

This was cited with approval in *Corbin v. Corbin,* _____ W. Va. _____, 206 S.E.2d 906 (1974).

The doctrine that a property settlement agreement providing for periodic support may be enforced regardless of whether the recipient of the support payments were entitled to a divorce or at fault in the underlying marriage relationship was reaffirmed in the case of *Farley v. Farley*, 149 W. Va. 352, 141 S.E.2d 63 (1965). In *Farley* a husband and wife entered into a property settlement agreement providing for the husband to pay the wife $20 per week. This agreement was "ratified, ap-

proved and confirmed" by the trial court; however, it was not specifically merged into the decree. The husband contended that this periodic payment was alimony, and under the rule in *Cecil v. Knapp, supra,* argued that the award of alimony was void as the husband was awarded the divorce. This Court ruled that a valid property settlement agreement created a binding contract.

When *Farley* is read in conjunction with *Miller,* where the court specifically reserved Mrs. Miller's rights under the contract in spite of the fact that judicially decreed alimony was reduced because of economic conditions, the conclusion is irresistible that the law treats a contract for maintenance as entirely separate from judicially decreed alimony, and that while a contract may form the foundation for judicially decreed alimony, each may be separately enforced.

Accordingly, this Court would observe that probably if Mrs. Beard has an otherwise enforceable property settlement agreement awarding her a monthly payment of $600 she may enforce the *contract* in a regular action at law on the *contract*. The fact that the descriptive word "alimony" is used in the contract to characterize Mr. Beard's payments does not undermine the clear intent of the parties. Contracts are frequently drafted in an inartful manner, and where a court can determine the clear intent of the parties, it will give effect to that clear intent regardless of the language used. *Toothman v. Courtney,* 62 W. Va. 167, 58 S.E. 915 (1907); *Taylor v. Buffalo Collieries Co.,* 72 W. Va. 353, 79 S.E. 27 (1913); *Eastern Gas and Fuel Associates v. Midwest-Raleigh, Inc.,* 374 F.2d 451 (4th Cir. 1967) *cert. denied* 389 U.S. 951, 88 S. Ct. 333, 19 L. Ed. 2d 360.

While it may be possible to define fault in a domestic relations context for legal purposes, the concept of fault in the broader moral sense is eminently illusory. The parties to a marriage frequently have a far better concept of what is a just settlement between them at the dissolution of their marriage than any court can possibly have. For that reason, as the Court said in the *Far-*

*ley* case, *supra*, "Not only are property settlement agreements validly entered into, not against public policy, but they occupy a favorite position in the courts." Therefore when a valid property settlement agreement has been executed by the parties, unless such agreement is induced by fraud, is collusive, or promotes separation or divorce, it will be enforced in an appropriate action at law.

For the foregoing reasons the writ of prohibition for which the petitioner prays is awarded.

*Writ awarded.*

HADEN, CHIEF JUSTICE, *concurring*:

I respectfully concur with the decision to award the writ of prohibition but question the scope of the opinion prepared by Justice Neely for the Court.

Although I am in sympathy with the goals of the draftsman, I believe Part II of the Court's opinion is wholly *obiter dicta* since the only question before the Court was whether prohibition should be awarded to prevent enforcement of a void award of alimony made to an offending party in a divorce action. Accordingly, while I recognize that syllabus points 4. and 5. correctly state the law of this jurisdiction, I believe those statements are not part of the law of this case.

Certain other statements of legal propositions relating to the severability of alimony awards and contractual agreements for maintenance of a party are overbroad and do not distinguish situations wherein the law treats contractual agreements for support as merged into judicial awards of alimony. See the majority's discussion of *Miller v. Miller, supra* and *Farley v. Farley, supra,* and the conclusion which follows. As to the majority's discussion of a court's ability to construe a contract, I believe that interpretation is not authorized unless the contract in question is first determined to be ambiguous. Plain provisions in a contract should be applied, not con-

strued. *State ex rel. Ashworth v. State Road Commission*, 147 W. Va. 430, 128 S.E.2d 471 (1962).

I am hopeful that this Court will have the opportunity to examine more precisely the gratuitous discussion of principles contained in Part II of the majority opinion on an occasion when those matters are presented for resolution.

I am authorized to state that Justice Sprouse joins in this concurring opinion.