# CHARLESTON.

STEELSMITH v. GARTLAN *et al.*

Submitted February 10, 1898—Decided April 16, 1898.

1. OIL LEASE—*Construction of Lease—Title of Lessee.*
     A lease for the purpose of operating for oil and gas for the period of five years, and so much longer as oil or gas is found in paying quantities, on no other consideration than prospective oil royalty and gas rental, vests no present title in the lessee except the mere right of exploration; but the title thereto, both as to the period of five years and the time thereafter, remains inchoate and contingent on the finding, under the explorations provided for in such lease, oil and gas in paying quantities. (p. 34.)

2. OIL LEASE—*Title of Lessee—Nonproductive Well.*
     The completion of a nonproductive well, though at great expense, vests no title in the lessee. (p. 36.)

3.  OIL LEASE—*Construction of Lease.*

> Such lease must be construed as a whole, and if there is no provision therein contained requiring the boring of another well after the first unsuccessful attempt is completed and abandoned, the lease becomes invalid, and of no binding force as to any of its provisions.  (p. 35.)

Appeal from Circuit Court, Ritchie County.

Bill by Amos Steelsmith against James Gartlan and others.  Decree for defendants and plaintiff appeals.

*Reversed.*

V. B. ARCHER, for appellant.

VAN WINKLE & AMBLER and W. W. ARNETT, for appellees.

DENT, JUDGE:

On the 30th day of August, 1889, Knotts and Garber obtained a lease for oil purposes covering the land in controversy in this suit, without other consideration than one-eighth of the oil produced and two hundred dollars per annum for each paying gas well, with the stipulation that the lessees should complete a well within one year from the date of the lease; and the failure to do so rendered the lease null and void unless the lessees should pay twenty-five cents per acre from and after the time above specified for the completion of said well, when such payment should operate to extend the time for five years.  This lease David McGregor considered forfeited, and refused to accept the rent therefor, or continue the same in force.  If the conditions had been performed by payment of rent accepted by the lessor, it would have expired the 30th of August, 1895, no well having been drilled by Knotts and Garber.  On the 10th day of February, 1895, Matilda McGregor, as devisee and executor of David McGregor, then deceased, executed the following lease to James Gartlan, to wit:

"An agreement, made the 11th day of February, A. D. 1895, between Matilda McGregor, of the district of Grant, county of Ritchie, and state of West Virginia, lessor, and James Gartlan, of Pittsburg, Pennsylvania, lessee, witnesseth:  That the lessor, in consideration of one dollar, the receipt of which is hereby acknowledged, and of other

valuable considerations, do hereby demise and grant unto the lessee, his heirs or assigns, all the oil and gas in and under the following described tract of land, and also the said tract of land, for the purpose and with the exclusive right of operating thereof for said gas and oil, together with the right of way, the right to lay pipes over and use water from said premises, and also the right to remove at any time all property placed thereon by the lessee, which tract of land is situated in the district of Grant, county of Ritchie, and State of West Virginia, and is bounded and described as follows, to wit: North by lands of Andrew Douglass and B. & O. Railroad, east by lands of Andrew Douglass and Jacob Hatfield, south by lands of A. M. Douglass and others, west by lands of Andy Hall and others, containing one hundred and twenty-two acres, more or less; to have and to hold the same unto the lessee, his heirs, and assigns, for the term and period of five years from the date hereof, and so much longer as oil or gas is found in paying quantities thereon, yielding and paying to the lessor the one-eighth ($\frac{1}{8}$) part of all the oil produced and saved from the premises, delivered free of expense into tanks or pipe lines to the lessor's credit; and, should any well produce gas in sufficient quantities to justify marketing, the lessor shall be paid at the rate of two hundred dollars per year for such well so long as the gas therefrom is sold, lessor to have gas for domestic use on the premises free, she making her own connections. Second party covenants and agrees to locate all wells so as to interfere as little as possible with the cultivated portion of the farm, and to pay all damages to growing crops by reason of operations. No well to be drilled on this lease within five hundred feet of the buildings as now located, without the consent of both parties. In case no well shall be completed on the above described premises within one month from the date hereof, this lease shall become null and void, and without any further effect whatever, unless the lessee shall pay for further delay at the rate of fifty dollars per month in advance thereafter until a well shall be completed. Such payment may be made in hand or by deposit to the lessor's credit in Second National Bank of Parkersburg. If above mentioned well produces 20 bar-

rels of oil per day for the first thirty days after completion, the lessee agrees to drill 2 more wells on the above-mentioned premises within a year from the completion of the above-mentioned well; provided that the second well drilled produces 20 barrels of oil per day for the first 30 days after completion. If second well does not produce 20 barrels per day for first thirty days after completion, then it shall be optional with the lessee to drill the third well. All wells shall be served with the best known means to produce the greatest quantity of oil. A failure to comply with any of the conditions of this lease shall render the same null and void, and of no effect. It is agreed further that second party shall have the right at any time to surrender this lease to first party for cancellation, after which all payments and liabilities to accrue under and by virtue of its terms shall cease and determine, and the lease become absolutely null and void. It is understood that all the terms and conditions between the parties hereto shall extend and apply to their respestive heirs, executors, administrators and assigns. In witness whereof, the said parties have hereunto set their hands and seals the day and year first above written. Matilda McGregor. [Seal.] Matilda McGregor, Executrix. [Seal.] —— —— [Seal.] James Gartlan. [Seal.]

"Sealed and delivered in the presence of —— ——."

Gartlan, with the assistance of others, put down a test hole about one thousand eight hundred feet by April following, but, finding neither gas nor oil in paying quantities, removed the derrick and tools, pulled the casing, and plugged the hole, and left the premises. At the same time he surrendered a number of other leases, but through his agent, Parks, asked permission of Mrs. McGregor to retain the lease under consideration for a short time. During the time the test was made the lessee paid Mrs. McGregor three monthly payments of fifty dollars each, as stipulated, because of delay in completion of the first well. He then discontinued such payments, and entirely abandoned and ceased further operations for oil and gas on the premises. Mrs. McGregor, according to her testimony, before he stopped operations, insisted that he should go deeper, and make a more thorough test, even

being willing to part with a further portion of her interest in the result, if successful, if he would consent to do so. But, claiming that he had made a full test, he refused her request. Gartlan had taken a man by the name of Hays in with him. On the 17th of September, 1896, Mrs. McGregor wrote them the following letter: "Cairo, W. Va., Sep. 17, 1896  Mess. Hays and Gartlan—Gentlemen: As you have abandoned the lease given you by me on our farm, and shown by your actions that you did not intend to operate it any further, I would ask you kindly to send it to me with a release deed, as I am now ready to lease again. Please give this your earliest attention, and oblige, M. McGregor." Getting no reply from this, she wrote another letter to a Mr. Parks, who had acted as agent for Gartlan, to wit: "Cairo, W. Va., September 28, 1896. Mr. Parks—Sir: I wrote a letter some time ago to Mr. Gartlan and your uncle, asking them kindly to send me the lease that they have been holding on my place. You know you only asked me to hold it for a short time, and now I think I have waited a sufficient time for them to make up their minds on what they intended to do; and they have shown, by abandoning the lease, that they did not intend to operate it, so I think they ought to send me the lease at once, so I could be making something out of it, as life is too short for me to let that amount of land lie idle, and not be making even the taxes off it. Now, please take this in consideration, and act on this at once, as you know I mean business. And I understand you have Mr. Gartlan's place in the Co. now. I don't know what position Gartlan holds in the Co. at this time. Now, do please give this your attention at once, as I am going to lease. I am going to get something out of it or nothing, as the case may be. That remains to be seen. I may get a 19½ barrel well next time and may be another dry hole. I can't tell. Now, you understand me. I am going to lease at once if I don't hear from you by return mail. Yours, in haste, your friend, M. McGregor." To this she also received no reply, when she wrote a third letter, as follows, to wit: "Cairo, W. Va., Oct. 3, 1896. Mr. Parks—Sir: I wrote you on the 28th Sep., asking for the lease that your Co. holds on my farm; asked you to answer me by return mail, and I think you have

had sufficient time to write, and now I am going to write you again, and now I want an answer by wire, as I have no time to wait for mails. Well, Mr. Gartlan was here since, and left again without doing anything. He still wants me to wait and see the Wilson and Church wells come in before he does anything, so that will develop the other two sides of the lease. I told him I was not willing to wait any longer; if he was going to do anything, now was the time to do it, while the excitement is up. I can lease now, and to a good advantage; but, if either of those wells should come in dry, it will give another black eye, and I could not lease it at all. So I think he is injuring me in holding this lease from me, and not going to work on it at once, and protecting the lines. If he is not willing to take a risk on it, I am not either. I told him if they wanted to hold it any longer they would have to pay me the back rental. I could have leased it long ago, and been getting more from it than the back rental is worth; but I feel conscientious in the matter, and did not feel disposed to give them any trouble over it, as you know I could be putting a lease on top of theirs. It might cause a lawsuit, at least, and that would cost them more than the rental, so you see I want to treat them fairly, and do what is right by them, if they will let me do so; but, if they will not, then the only thing left for me to do is to look out for myself and the interest of this estate which I represent. Mr. Gartlan promised me he would see your uncle just as soon as he reached Pittsburg, and wire me what he was willing to do in the matter. Now, I will wait a sufficient time for his telegram, and also for yours, and, if I fail to get one, then I am going to lease at once. I have a good offer, and am going to take it now while the excitement is up. I am offered more bonus than all the back rental comes to and the ¼ of the oil if there is any, and, if there is none, I will have the bonus anyway. Now you see my offer is a good one, and they can't blame me for taking it. And now for your lease, or the rental at once, as there is no time to wait, and you know I mean just what I say. So please let me hear from you at once by wire, as the parties are waiting, and are willing to take it at their own risk. Please see your uncle at once, and wire me his conclusion. We

have a telegram office here at Cairo. Yours in haste, M. McGregor.'' Then, getting no satisfaction from the parties, either in the way of rentals or a new lease, on the 22d of October, 1896, she executed a new lease to Amos Steelsmith, the plaintiff and appellant in this case. In the the meantime the parties claiming under the Gartlan lease moved some timbers on the land, as though in preparation for again boring, which Mrs. McGregor had cast off. Steelsmith, under his lease, proceeded forthwith to put down two wells, both coming in producers, when, before going to further expense, he filed his bill to cancel the Gartlan lease as a cloud on his title. The Gartlan lessees filed an answer in the nature of a cross bill, claiming the cancellation of Steelsmith's lease and the oil wells and their production, which was sustained by the court, and the relief sought granted. Knotts and Garber, also, to a supplemental and amended bill filed by Steelsmith, filed an answer in the nature of a cross bill, praying for affirmative relief, which was denied, and the bills were dismissed. Steelsmith appeals.

The question of importance presented to the Court is as to whether the Gartlan lease was at an end at the time the Steelsmith lease was executed. The Gartlan lease is, with slight variance, in the usual form of such leases, and amounts to nothing more than the privilege of searching for oil and gas, and, if they be found in paying quantities, then vests an oil and gas tenancy in the lessee for the period of five years or until exhaustion. Mrs. McGregor entered into the lease for the sole consideration of the prospective rents and royalties she would enjoy if the lessee, in diligent search therefor, should find oil and gas in paying quantities. If such lease failed to bind the lessee to diligent search for oil and gas, it was without consideration, binding on neither party, and voidable, if not void, at the pleasure of either. *Cowan* v. *Iron Co.*, 83 Va., 547, (3 S. E. 120); *Petroleum Co.* v. *Coal, Coke & Mfg. Co.*, 89 Tenn., 381, (18 S. W. 65). The only provision in the lease binding the lessee to prosecute operation thereunder with diligence is as follows: ''In case no well shall be completed within one month from the date hereof, this lease shall become null and void, and without any further effect what-

ever, unless the lessee shall pay for further delay at the rate of $50 per month in advance thereafter until a well shall be completed. * * * If above mentioned well produces 20 barrels of oil per day for the first 30 days after completion, the lessee agrees to drill 2 more wells on the above-mentioned premises within one year from the date of the completion of the above-mentioned well, provided that the second well drilled produces 20 barrels of oil per day for the first 30 days after completion." There is no provision made for any further operations or payment of rent in case the first well, when completed, is nonproductive. But the contract is at an end as to both parties as soon as such first well is abandoned as unsuccessful. "A vested title cannot ordinarily be lost by abandonment in a less time than is fixed by the statute of limitations, unless there is satisfactory proof of an intention to abandon. An oil lease stands on quite a different ground. The title is inchoate, and for the purpose of exploration only, until oil is found. If it is not found, no estate vests in the lessee, and his title, whatever it is, ends when the unsuccessful search is abandoned." *Oil Co.* v. *Fretts,* 152 Pa. St., 451, (25 Atl. 732); *Plummer* v. *Iron Co.,* 160 Pa. St., 483, (28 Atl. 853); *Crawford* v. *Ritchie,* 43 W. Va., 252, (27 S. E. 220). This unsuccessful search and abandonment in this case applies to the first well, the only one the lessee stipulated to put down unless gas and oil were found in paying quantities. He could not, as he himself maintains, be compelled to put down another well; and, he not being bound, the lessor was not bound either, for the only consideration left to her was the prospective oil royalties and gas rentals, which the lessee was in position to entirely defeat. Contracts unperformed, optional as to one of the parties, are optional as to both. Nor can there be a different conclusion if it is held that the lease, being for the purpose of operating for oil and gas, is subject to the implied precedent condition, according to the decisions of some of the states, notably North Carolina, that the lessee shall diligently prosecute the search and operation, for in such case the forfeiture would follow in a much less time than eighteen months under the general clause, to-wit: "A failure to comply with any of the conditions of this lease shall

render the same null and void and of no effect,'' which necessarily applies to implied as well as express conditions.   *Conrad* v. *Morehead*, 89 N. C., 31; *Maxwell* v. *Todd,* 112 N. C., 677, (16 S. E. 926); *Hawkins* v. *Pepper*, 117 N. C., 407, (23 S. E. 434).   In the case of *Munroe* v. *Armstrong*, 96 Pa. St., 307, it was held that a cessation of active operations for thirty days forfeited a lease for oil purposes.   The court says, on page 310: "An oil lease yields nothing to the landowner when not worked,· and is an incumbrance on his land, tying his hands against selling or leasing to others; but, when idle, it costs the lessee nothing, and is valuable, or may prove valuable, if he can hold it waiting developments in its vicinity.   If a well be productive, it is the interest of both the lessor and the lessee that it be continuously operated until its exhaustion, but, if dry, it is of no value.   Holding on to a lease after ceasing search is often for purposes of speculation, the thing which a prudent landowner guards against.   Forfeiture for nondevelopment or delay is essential to private and public interests in relation to the use and alienation of property."   In this case the condition was express, but the same rule applies with equal force to implied conditions. However, as before shown, the lessee having abandoned the only obligatory search provided for in his lease, it died on his hands without surrender, forfeiture or intentional abandonment on his part, for he was without authority to make further explorations without the consent of and arrangement as to conditions with the lessor; in other words, without a new lease or extension of the old.   Such leases are construed most strictly against the lessee and favorable to the lessor.   *Bettman* v. *Harness*, 42 W. Va., 433, (26 S. E. 271).   When a lease provides the mode, manner and character of search to be made, implications in regard thereto are excluded thereby as repugnant.   And the demise for the purpose of operating for oil and gas for the period of five years is dependent on the discovery of oil and gas in the search provided for, and, if such search is unsuccessful, the demise fails therewith, as such discovery is a condition precedent to the continuance or vesting of the demise.   The lessee's title being inchoate and contingent, both as to the five-years limit and time thereafter,

on the finding of oil and gas in paying quantities, did not become vested by reason of his putting down a non-productive well. This gave him no new or more extensive rights than he enjoyed before, but in fact destroyed all his rights under the lease. As is said in *Williamson* v. *Jones*, 43 W. Va., 562, (27 S. E. 411). "As an abortive well neither enhances the value nor yields anything to the true owner, he ought not to be charged with the costs thereof." The lessee would charge the expense of this abortive well as though it were a part of the consideration for this lease, when it was plainly evident that no such thing was ever had in contemplation by the parties, but this is a mere desperate afterthought to furnish a nonexistent money consideration for the continuance of the lease. A dry hole, plugged up and abandoned, while expensive to the lessee, is no advantage, but an incumbrance, to the lessor. Then why should she pay for it by a nonoperating and indefinite extension of the lease, to await the will and pleasure of the lessee, who claims the option to operate, abandon, surrender, or forfeit at his pleasure, while numerous others are clamoring for the privilege of diligent operation, and offering a large bonus therefor? Such a holding would be unconscionable, and contrary to both right and justice. Mrs. McGregor's letters are given at length, to show how fully she understood her rights, and yet how willing, out of tender womanly sympathy, she was, in consideration of her lessee's fruitless expenditures, for which she was in no wise responsible, to give her lessee the first option of a new lease. This she was not required to do, and it was wholly gratuitous on her part, but she did not surrender or lose any of her rights thereby. The reason that the lessee gives for the abandonment of the well and the removal and sale of his tools and machinery being that he was endeavoring to escape the process of the courts of this State to avoid unjust litigation, is not a legal or justifiable excuse. In the case of *Cryan* v. *Ridelsperger*, 7 Pa. Co. Ct. R., 473, an excuse that the lessee was unable to put down a well on account of the extremely cold weather was held insufficient to prevent a forfeiture, and yet it was much more reasonable than the one given by the lessee in the present case. No excuse, though ever so good, could

relieve from the operation of a contract which was at an end by virtue of its own terms. The time the Garber and Knotts lease had to run, in any event, expired before the Steelsmith lease was executed, and hence they have no rights against the latter lease and cannot attack it in any manner for any reason. For the foregoing reasons the decree complained of is reversed, the lease known as the "Gartlan lease," bearing date the 11th day of February, 1895, is cancelled and annulled, and the injunction originally awarded in this case is made perpetual.

*Reversed*