# CHARLESTON.

SMITH *v.* ROOT *et als.*

Submitted February 24, 1909.   Decided January 25, 1910.

1. MINES AND MINERALS—*Oil Leases—Action by Senior Lessee—Enjoining Removal of Oil—Jurisdiction of Equity.*

   Equity has jurisdiction of a suit brought by the senior lessee in an oil lease against his lessor and a junior lessee of the same land from the same lessor, for the purpose of enjoining the removal of the oil from the leased premises and for specific execution of his lease; and, in such a suit, the court can settle the conflicting claims of the lessees, and grant such relief to either claimant as the pleadings and proof may warrant.  (p. 635).

2. SAME—*Oil and Gas Lease—Construction.*

   An oil and gas lease giving the lessee the right, for the period of ten years, to explore for oil and gas, and providing that if a well is not completed on the leased premises within three months from the date of the lease the lessee shall pay to the lessor, in advance, a quarterly cash rental for each additional three months the completion of a well is delayed, is an executory contract and vests no title in the lessee to the oil and gas in place.  (p. 635).

66 W. Va.

3. SAME.

   Such a contract contemplates development of the leased prem-
   ises within a reasonable time, and the lessee may lose his rights
   thereunder before the expiration of the ten years by abandon-
   ment of the lease, notwithstanding there is no forfeiture clause
   in the contract.  (pp. 637, 638).

4. SAME—*Oil and Gas Lease—Abandonment by Lessee—Intention.*
   If the lessee has not actually entered upon the land, the relin-
   quishment of his right to do so, or his abandonment, becomes
   purely a question of his intention, and may be established by
   proof of such facts and circumstances as evince a voluntary
   waiver of his rights.  (p. 639).

5. SAME—*Oil and Gas Lease—Abandonment by Lessee—Evidence.*
   A case in which the evidence proves a voluntary abandon-
   ment of the lease by the lessee.  (p. 640).

Appeal from Circuit Court, Roane County.

Bill by H. L. Smith against C. M. Root and others.  Judg-
ment of dismissal, and plaintiff appeals.

*Affirmed.*

*John B. Chapman, V. B. Archer* and *Geo. F. Cunningham,*
for appellant.

*Thos. P. Ryan, A. D. Follett,* and *Van Winkle & Ambler,* for
appellees.

WILLIAMS, JUDGE:

This is an appeal from a decree of the circuit court of Roane
county, pronounced on the 29th day of August, 1907, dissolving
an injunction which had previously been awarded to plaintiff,
and dismissing his bill upon a hearing of the cause.

The suit grows out of conflicting oil and gas leases executed
by Mrs. D. M. Hall and C. J. Hall, her husband, on a tract of
106 acres of land in Roane county.  The plaintiff claims under
a contract executed by the Halls to Lee Goff and A. S. Heck,
bearing date February 29, 1904, and the defendants claim under
a contract made by said Halls to S. L. Thornily, dated June
27, 1905.  Both contracts were duly recorded, the first on May
4, 1904, and the second on August 7, 1905.

The object of the suit is to enjoin the defendants from
operating on said land and from removing and disposing of the
oil produced from the wells drilled by them on the premises

in controversy, and to have the second lease cancelled as constituting a cloud upon plaintiff's title.   Defendants demurred to the bill and also filed a cross-bill answer averring an abandonment of the first lease by Goff and Heck, the original lessees under whom plaintiff claims, and praying for a cancellation of that lease as constituting a cloud upon their title.   The demurrer to the bill raises the question of the jurisdiction of the court. It is hardly necessary to discuss this question, because it has been frequently held by this Court, and the question apparently settled, that a court of equity has jurisdiction of such a suit. In the present case it has jurisdiction on two grounds: first, to prevent waste, that is, the extraction and removal of the oil from the land; second, for specific enforcement of the lease contract; and, having jurisdiction, the court will administer complete relief.   *Williamson* v. *Jones,* 43 W. Va. 562; *Crawford* v. *Ritchey, Id.* 252; *Eclipse Oil Co.* v. *South Penn Oil Co.,* 47 *Id.* 84; *Urpman* v. *Lowther Oil Co.,* 53 *Id.* 501; *Carney* v. *Barnes,* 56 *Id.* 581; *Starn* v. *Huffman,* 62 *Id.* 422; *Eastern Oil Co.* v. *Coulehan,* 65 *Id.* 531.

The lease to Goff and Heck was to remain in force for ten years, and as much longer as either oil or gas should be produced.   The lessees were to deliver to the credit of the lessors free of costs in the pipe-line one-eighth part of all the oil, and were to pay $200 a year for every gas well the product from which should be marketed and used off the premises.   The lease contract contained also the following provision: "Second party (Goff and Heck) covenants and agrees to  *   *   *   * complete a well on said premises within three months from the date hereof or pay at the rate of $26.50 Dollars quarterly, in advance, for each additional three months such completion is delayed from the time above mentioned for the completion of such well until a well is completed; and it is agreed that the drilling of such well, productive or otherwise, shall be and operate  as full liquidation of all rental under this provision during the remainder of this lease.   Such payment may be made direct to lessor or deposited to their credit in the Roane County Bank at Spencer, W. Va.   It is agreed that the second party is to have the privilege of using sufficient water from the premises to run all necessary machinery and at any time to re-

move all machinery and fixtures placed on said premises, and further upon the payment of One dollar at any time by the party of the second part, their successors or assigns to the parties of the first part their heirs or assigns, said party of the second part, their successors or assigns shall have the right to surrender this lease for cancellation after which all payments and liabilities thereafter to accrue under and by virtue of its terms shall cease and determine and this lease become absolutely null and void."

About the same time Goff and Heck procured oil and gas leases upon other tracts of land in the same neighborhood, some of which were contiguous to the Hall tract. Shortly after obtaining these leases Goff and Heck, and others, procured a charter and organized the Lucky Oil & Gas Company. Goff and Heck assigned to it all the working interest in said leases, except one-eighth which they retained for themselves. The contract of assignment provided that the Lucky Oil & Gas Company was to pay the rentals thereafter to become due, and was to carry Goff and Heck for the full one-eighth interest free of cost to them, and bound said corporation to drill at least one test well on the territory covered by the leases, and gave it the privilege of drilling other wells on the premises. It further provided "that all surrenders and forfeitures of said leases, or any of them, shall be to said first parties," that is, to Goff and Heck; and that "in no event shall any or either of said leases be forfeited or surrendered by the said second party to the original lessors or their assignee or grantee or any person or persons for them."

The first two quarterly rentals falling due on the Hall land were paid by the Lucky Oil & Gas Company. When the third became due, to-wit, on November 29, 1904, it was not paid, but Goff and Heck applied to the Halls for an extension of the time without payment of the rent, which was refused. No well was ever drilled on the Hall land by anyone claiming under this lease; but the Lucky Oil & Gas Company did, in the summer and fall of 1904, drill a well on the Donohue tract of land adjoining the Hall tract. It was completed just prior to the time the third quarterly rental on the Hall tract became due, and proved to be a dry well. In the drilling of this well the

company had exhausted its capital. It then ceased to do business and immediately surrendered its charter. The casing was removed from the dry well and the machinery and casing belonging to the company were sold and the proceeds applied to the payment of its debts. Nothing further was done toward the discovery of oil or gas until in the early part of the year 1906, when the defendants began operations on the Hall land under the lease to Thornily, made June 27, 1905. Defendants completed their first well June 28, 1906, and their second well September 26, 1906, both of which produced oil. They began to drill the third well on October 25, 1906, but were enjoined by order of court in this suit before the well was completed. The injunction order was later modified so as to permit the completion of this well which also proved to be an oil producing well. All three of these wells are on the Hall tract. The plaintiff, Smith, claims the exclusive right to the oil and gas in the Hall tract and in a number of other tracts in its vicinity by assignment from Goff and Heck made on the 6th of February, 1906. At the time of this assignment to Smith five quarterly rentals were past due on the Hall lease to Goff and Heck, and on the day after the assignment Goff and Heck deposited to the credit of the Halls in the Roane County Bank $132.50 to pay these back rentals. This money is now in the bank.

The vital question in the case is whether, or not, the Goff and Heck lease had been voluntarily abandoned, or their rights thereunder relinquished by them before June 27, 1905, at which time the Halls made the second lease to Thornily, the lease under which defendants claim. It is true, as counsel for appellant contends, that there is no express forfeiture clause in the contract, but this does not prevent the lessees from voluntarily abandoning the lease. The contract expressly gave them the right to surrender the lease at any time, upon the payment to the lessor of one dollar. This provision in the contract was evidently intended for the benefit of the lessee and to avoid the payment of any further cash rental. This is one method by which the lease could certainly have been ended, but it did not preclude the possibility of terminating the contract by some other method. If the lessees chose to abandon the enterprise, and thus to put an end to the contract, without an actual return

to the lessor of the lease contract and the payment to him of the one dollar, they could surely do so, but not without liability to him for the cash rental then due. On the other hand, the lessor could waive his right to collect the cash rental, and in the event of an actual abandonment by the lessees, could release the premises. This contract, commonly called an oil and gas lease, did not invest Goff and Heck with any estate in the oil and gas in place; it simply gave them the exclusive right to make exploration upon this land for oil and gas. Their right was simply an *inchoate* right, not a vested estate in land. The lease is an executory contract in the nature of a license to enter upon the land and make exploration for oil and gas for a period of ten years, and longer if oil or gas should be discovered, and to extract them from the earth. No estate could vest until discovery. Consequently, the rights of the respective parties under this lease are not to be determined solely by the rules of law applicable in determining whether or not, an estate in lands, once vested, has been forfeited. Neither is it necessary that a lease, such as the one under consideration, should contain a forfeiture clause before it can be shown that the lessee actually relinquished all his rights thereunder; in other words, that he abandoned the lease. A lessee may abandon the premises notwithstanding there is no forfeiture clause. His failure to pay the cash rentals stipulated in the contract may not alone be sufficient to prove abandonment; but his failure to pay, taken in connection with other facts and circumstances evincing a clear intention to abandon the enterprise, coupled with the fact that no operations were ever begun upon the land, is sufficient to prove relinquishment of lessee's right. If abandonment by a lessee, who has taken possession and begun operations on the premises, can be established by proving a relinquishment of the leased premises, coupled with an intention to abandon, it certainly follows that an abandonment, or what is practically the same thing, a relinquishment of his rights by a lessee who has never taken possession, or begun operations on the leased premises, may be established by proving that he had abandoned his intention to do so. *Urpman* v. *Lowther Oil Co.*, 53 W. Va. 501; *Steelsmith* v. *Gartlan*, 45 *Id.* 27; *Parish Fork Oil Co.* v. *Bridgewater Gas Co.*, 51 *Id.* 583; *Crawford* v. *Ritchey*, 43 *Id.*

252;*Toothman* v. *Courtney, 62 Id. 167; Sult* v. *Hochstetter Oil Co., 63 Id. 317.*

There is an implied covenant in the lease under consideration that lessees will use diligence to develop the property. *Steelsmith* v. *Gartlan, supra; Toothman* v. *Courtney, supra;* and *Parish Fork Oil Co.* v. *Bridgewater Gas Co., supra.* In view of this implied agreement to use diligence in making development, the failure to do so or to pay the cash rentals for a long time becomes a potent element of proof of intention to abandon.

Did Goff and Heck actually abandon their right to make exploration? Whether they did, or not, is a matter of intention; and their intention is to be determined from their conduct and declarations. It is shown by the testimony of a number of witnesses that both Goff and Heck considered that their rights to make further exploration terminated on the 29th of November, 1904, when the third quarterly cash rental became due, and was not paid. But it is argued by counsel for appellant that this was a misconstruction of the contract, a misapprehension of their legal rights, a mistake of law by which they should not be bound. But if such was their understanding of the agreement, and they acted upon it, how can they be heard to complain of their own mistake of law? If such was their interpretation of the writing, then it might well be said that such was in fact their agreement, so long as it did not militate against the rights of the lessor. The lessor and lessees both put the same construction on the contract; they both thought that a failure to pay the cash quarterly rental, promptly in advance, terminated the contract; and if the lessees abandoned their rights in ignorance of what those rights actually were, they were not misled by the lessor to do so, and they have only themselves to blame. They were not vested with title to real estate by the contract; they simply had the right, by its terms, to hold the lease for a period of ten years, even without making any effort to develop. But they were also bound to pay at the rate of $26.50 a quarter as a consideration for this right; and, thinking their rights would cease if payment was not promptly made, they applied to the lessor for a continuation of the lease through another quarter without pay of rental, and this was refused. This shows the understanding of the contracting parties.

Neither was misled by the other. The lessees are now, in effect, asking to be relieved against the consequences of a mistake of law committed by themselves. It is a rule, almost universally applied by the courts, that relief can not be given in favor of one who has committed a mistake of law. *Zollman* v. *Moore,* 21 Grat. 313; *Meem* v. *Rucker,* 10 Grat. 506; *Harner* v. *Price,* 17 W. Va. 523; *Home Co. &c.* v. *Floding,* 27 W. Va. 540; *Shriver* v. *Garrison,* 30 W. Va. 456. Consequently, the reason, or motive, for the abandonment, if one actually occurred becomes immaterial.

But it seems to be very clearly proven that Goff and Heck regarded the lease of no value and that this is the reason for their abandoning the enterprise. Goff and Heck were both officers of the Lucky Oil & Gas Company which they had been instrumental in organizing for the purpose of developing this property. This company bored one dry well on a contiguous farm, and exhausted its funds in doing so. It hastened the completion of this well before the 29th of November, 1904, for the purpose of avoiding the payment of the cash quarterly rental then to become due. As soon as the dry well was completed the Lucky Oil & Gas Company ceased to do business and surrendered its charter. Shortly after the third rental became due, Heck told Sherman Nicholson, under whom they held an oil lease in the same territory, that the Lucky Oil & Gas Company had gone out of business and that if Nicholson wanted to give another lease on his land "to go ahead and lease." This witness further says that Heck told him that the reason why they did not surrender the leases was because it would cost at least sixteen dollars to do so. John Nutter, who had also leased to them and whose lands joined the Donohue land, says that he had a conversation with Goff and Heck after the dry well was bored on the Donohue place and that in that conversation they told him that they had nothing to do with the leases, that they had sold the leases to the Lucky Oil & Gas Company. This was after the third rental had become due to Nutter whose lease was of the same date as the Hall lease. Linnie Nutter, wife of John Nutter, says that Heck was at their home in January, 1906, and asked her if Nutter had leased his land and when she told him that he had "optioned it" he replied that he was sorry

because he wanted to lease it himself. Adam Goebel who had also given Goff and Heck a lease for oil and gas on March 2, 1904, and which is also one of the leases transferred to the Lucky Oil & Gas Company by Goff and Heck, and later sold by them to Smith, the plaintiff, says that after the third rental became due on his lease and was not paid, he had a talk with Heck about December 2, 1904, and that Heck then told him that he had nothing to do with the lease, that the Lucky Oil & Gas Company had surrendered its charter and that the lease was null and void. J. A. Epling, another one of their lessors, says that he had a conversation with Heck in January, 1906, and Heck wanted to know of him if he had leased his land, and when witness told him he had "optioned it" Heck said that he was sorry, that he would have advanced him ten cents an acre on the first rental. Similar testimony was given by a number of other witnesses. Some of this testimony is denied by Goff and Heck, but much of it is admitted substantially as related by the witnesses. All of this testimony is in relation to conversations had between the witnesses and either Goff or Heck, before the time of the assignment of leases by Goff and Heck to H. L. Smith. They relate also to leases which Goff and Heck held upon other tracts of land in the vicinity of the Hall tract, some of which adjoined the Hall tract, and are some of the same leases which Goff and Heck turned over to the Lucky Oil & Gas Company and which, they claim, were later returned to them by the said company at the time of its dissolution. This testimony was admissible only for the purpose of showing the intention of Goff and Heck to abandon the leases in that territory, and the Hall tract was one of them. The Hall tract was also one of the leases which had been assigned to the Lucky Oil & Gas Company. At the time when Heck wanted to know of Epling if he had leased his land, a producing well had been drilled in the neighborhood on a tract known as the Bee tract, and interest in the oil business was very much revived thereby. This fact no doubt explains Heck's anxiety to obtain another lease from Epling at that time. All of this testimony clearly shows that Goff and Heck had abandoned whatever rights they had under their leases which had been once held by the Lucky Oil & Gas Company. The drilling of

the dry well and the expenditure of $6,500 by the Lucky Oil
& Gas Company in the drilling of it, seems to have been sufficient
to satisfy Goff and Heck that they would be losing money by
the payment of any further cash rentals, and they then made
up their minds to abandon prospecting any further. Failure
to pay the quarterly rentals, taken by itself, would not be
sufficient to prove intention to abandon, but it is an evidential
fact which may properly be considered in determining inten-
tion. It materially strengthens the evidence of intention to
abandon which other facts tend to prove. The failure of Goff
and Heck to make any exploration for oil and gas on the Hall
tract for more than a year after the date of their lease, and
their failure to pay three successive quarterly rentals, taken in
connection with the other facts and circumstances hereinbefore
adverted to, we think clearly prove that they had abandoned
their rights under the lease. Such abandonment operated as
a *surrender in law* of their lease, and gave the Halls the right to
execute the lease to Thornily, under which the defendants
claim.

The fact that Goff and Heck were financially responsible
for the cash rentals and that such rentals could have been
collected by legal process does not affect the merits of the
controversy. The Halls could waive their right to sue, and
had a right to treat the contract as at an end whenever Goff
and Heck voluntarily abandoned their right to make further
exploration.

There is another circumstance in the record which tends
strongly to show abandonment. It is this, the minutes of the
stockholders' meeting of the Lucky Oil & Gas Company held
for the purpose of dissolution is entered upon the book of said
corporation in two places, one entry on page 9 and another on
page 11 of the corporation's book. The entry on page 9 was
made a few days after the meeting of the stockholders which
was held on the 24th of November, 1904, and appears to have
been made by A. S. Heck. The resolution authorizing the
return of the leases to Goff and Heck was not entered in the
body of the minutes, but was entered on the margin of the
page in pencil, afterwards by him. The same minutes are re-
entered on pages 11 and 12 of the corporation book by Mr.

G. F. Hopkins about fourteen months after the meeting, after the corporation was dissolved. This fact tends to prove two things, (1) that Goff and Heck regarded the leases of no value and forgot to have a resolution passed providing for the return of them, and (2) that it was desirable to present to Smith an unsuspicious record which would show a return of the leases to Goff and Heck by the corporation.

We think the court below was clearly warranted by the facts in finding that Goff and Heck had voluntarily abandoned their rights under the lease from the Halls prior to the execution of the second lease by the Halls to Thornily, and finding no error in the decree of the lower court the same will be affirmed.

*Affirmed.*