## APPEAL OF NELSON LAND & OIL CO.

Docket No. 1539. Submitted May 21, 1925. Decided January 14, 1926.

1. Certain instruments herein construed and *held* to be oil and gas leases, and not conveyances of oil or gas in place.
2. Amounts paid to the grantor of an oil and gas lease as a bonus *held* to constitute additional royalties and not a return of capital.

*R. Kemp Slaughter*, *Esq.*, for the taxpayer.
*A. H. Fast*, *Esq.*, for the Commissioner.

Before MARQUETTE and MORRIS.

This is an appeal from the determination of a deficiency in income and profits taxes for the year 1919 in the amount of $6,254.31. The sole issue arises out of the action of the Commissioner in increasing the net income for 1919 by the amount of $19,879, representing a bonus paid to the taxpayer in that year upon its grant of certain oil and gas leases to the Carter Oil Co.

### FINDINGS OF FACT.

Taxpayer is a corporation with its principal place of business at Charleston, W. Va.

On April 29, 1919, it acquired from the Boone Coal Land Co. two tracts of land in fee simple, and all the coal, oil, gas, and other minerals and mineral substances, and mining privileges in, upon, and under three other tracts of land; all of which lands were situated in Sherman District of Boone County, W. Va., on the waters of Big Coal River and Laurel Creek, a tributary thereof. The total purchase price amounted to $70,993.40, of which $10,000 was paid upon execution of the contract of sale, the balance to be paid in annual installments over a period of five years, as stipulated in the contract. The contract of sale estimated the total acreage of the lands involved to be 1,577.5 acres, divided as follows:

|  | Acres. |
|---|---|
| Tract No. 1 | 92 |
| Tract No. 2 | 65. 5 |
| Tract No. 3 | 95 |
| Tract No. 4 | 531 |
| Tract No. 5 | 794 |
| Total | 1, 577. 5 |

Tracts Nos. 3 and 5 are the lands as to which the taxpayer acquired title in fee simple; while as to tracts Nos. 1, 2, and 4 only the minerals in place were acquired, with such rights as were necessary and incidental to the exploration, development, and extraction of the minerals lying in, upon, and under the land.

On the same date a further and supplemental agreement was entered into by the taxpayer and the Boone Coal Land Co., which in terms provided as follows:

THIS AGREEMENT, Made the 29th day of April, 1919, by and between Boone Coal Land Company, a corporation organized and existing under the laws of the State of West Virginia, party of the first part, and The Nelson Land and Oil Company, a corporation organized and existing under and by virtue of the laws of the State of Maryland, party of the second part;

Whereas, by deed of even date herewith the said first party has conveyed to the second party herein certain lands situate in Boone County, West Virginia, part of the consideration in which conveyance is in the form of non-negotiable notes; and

Whereas, there are certain unreleased vendor's liens retained in some of the deeds in the title of the first party hereto to a part of said land; also certain taxes on a part thereof, which will have to be paid to relieve said title from forfeiture, and by reason of said forfeiture, or otherwise, title of the first party may fail as to part of said land.

Now, therefore, this agreement witnesseth:

In consideration of said conveyance and the money consideration therein stated, the first party hereto hereby agrees to promptly have released of

record all valid liens now standing on or against said lands or any part thereof; to pay all back taxes due thereon, and to take such steps as will fully relieve and redeem said title from forfeiture, and for such purpose bear and pay all expenses and fees, legal and otherwise in connection therewith; and

Whereas, said conveyance is based on an estimated acreage of 1577.5 acres, made up as follows:

A tract of ninety-two (92) acres, a tract of sixty-five and one-half (65-½) acres; a tract of ninety-five (95) acres; a tract of five hundred and thirty-one (531) acres; and a tract of seven hundred and ninety-four (794) acres, in tracts, 1, 2, 3, 4, and 5, respectively.

Therefore, it is further agreed, that should either party desire the acreage in any one or more of said tracts to be correctly ascertained by actual survey such party may, within one year from this date, request that such survey of said tract or tracts of land be made, and in such case it is agreed that such survey shall be made by John C. Child, surveyor, and the correct acreage in the tract or tracts surveyed and ascertained by him, or, in case the said Child cannot be secured to make said survey, then that it be made by some other surveyor to be agreed on mutually by the parties hereto, and in case the parties cannot agree upon a surveyor to make such survey, then it shall be made by two surveyors, one to be selected by each party, and it is agreed that whatever acreage may be ascertained by such survey, however made, in accordance with this agreement, shall be accepted by the parties hereto in adjusting and paying the purchase money; and in case the acreage in any of said tracts shall be reduced as the result of such survey, or should the title of the first party fail or be defeated as to any part thereof, then credit shall be given to the party of the second part upon the last of said purchase money notes for the price of the acreage so reduced or lost, at the rate of forty-five Dollars ($45.00) per acre, and should the acreage be increased by such survey, then the price of such increased or additional acreage shall be added to the last of said purchase money notes at the said rate of Forty-five Dollars ($45.00) per acre; such increase to be considered as if it had been included in said note at the time said note was given.

The party of the first part also agrees to pay all costs, expenses and fees, legal and otherwise, in the defense of the title to said land incurred before the payment of all of said deferred purchase money, but it shall also have the right and privilege of conducting all such litigation for second party if it elects so to do.

In further consideration thereof, it is agreed that the party of the second part may secure the release of the vendor's lien reserved in said deed on the tract containing 794 acres, or any part thereof, at any time before the maturity of said notes, by paying to the party of the first part for such tract in full or for such part thereof as he desires to have released from said vendor's lien, at the rate of forty-five dollars ($45.00) per acre, with interest from the date of said purchase money notes. And the amount so paid shall be credited upon the first of the Ten Thousand Dollar ($10,000.00) notes set out in said deed maturing after such payment, provided all notes which have matured before that date have been fully paid and discharged; and provided further, that in case the said party of the second part desires to pay for a part of said tract of 794 acres, he shall have such part laid off in such way as that it shall leave the residue of said tract so situated and located as to be of at least equal value per acre with that so paid for, as aforesaid, and in such manner as shall not render the remaining portion of said 794 acres less accessible than it now is.

The total acreage comprising the five tracts was subsequently reduced to 1,237 acres, because of defective titles and other adverse conditions. Which, and to what extent, each of the five tracts were affected is not shown by the record. On August 8, 1919, the Circuit Court for the County of Boone entered a decree quieting title to 774.10 acres, comprising a part of tract No. 5.

On May 13, 1919, the taxpayer granted to the Carter Oil Co. five separate leases covering the five tracts hereinbefore described. The pertinent provisions of these leases, all of which are printed and similar in form, are as follows:

This Agreement, Made the 13th day of May, A. D. 1919 between The Nelson Land & Oil Company, a corporation organized and existing under the laws of the State of Maryland, Lessor, and The Carter Oil Company, Lessee.

Witnesseth, That the Lessor, in consideration of one dollar, and other good and valuable consideration, in hand paid by the Lessee, receipt of which is hereby acknowledged, and of the convenants and agreements hereinafter contained, hereby grants and warrants specifically the title to, all the oil and gas in and under, and grants, demises and leases, with convenants of quiet possession, and of sole right to convey, all that certain tract of land hereinafter described, for the sole and only purpose of operating for and producing oil, gas and gasoline, together with rights-of-way and servitudes for pipe lines, telephone and telegraph lines, structures, houses and buildings for employees, and all other rights and privileges necessary, incident to and convenient for the economic operation of this land alone and conjointly with neighboring lands for oil, gas and gasoline, with the right to use free oil, gas, gasoline and water for such purposes, and with the right of removing either during or after the term hereof all and any property and improvements placed or erected on the premises by Lessee; also with the right of operating as one entire tract or of sub-dividing the premises situate in Sherman District, Boone County, and State of West Virginia, bounded and described as follows [description]:

To have and to hold unto and for the use of the Lessee for the term of five years from the date hereof and as much longer as oil, gas or gasoline is produced in paying quantities, yielding to the Lessor the one-eighth part of all the oil produced and saved from the premises, delivered free of expense to the Lessor's credit into tanks or pipe lines and, before such delivery, unaffected by any subsequent division or partition of the premises.

Should gasoline be manufactured from casing-head gas produced from oil wells on the premises hereby leased, the Lessor shall receive, in full payment for such gas, one-eighth of the surplus gasoline thus manufactured and saved, delivered in tanks provided by the Lessee on the premises, free of expense, or one-eighth of the proceeds, less the cost of marketing the same, payable to the Lessor semi-annually. The gasoline manufactured from casing-head gas produced on the premises hereby leased may be apportioned among several farms, according to the number of wells on each producing and supplying gas to the gasoline plant or plants.

Should a well be found producing gas only, then the Lessor shall be paid for the gas produced from each such gas well at the rate of one cent for every 1000 cubic feet of gas sold therefrom, payable quarterly while so marketed.

Lessee agrees to complete a well on said premises within six months from the date hereof or thereafter pay the Lessor twenty three dollars each three

months in advance from the 13th day of November, 1919, until said well is completed, or this lease surrendered. The drilling of a non-productive well shall be accepted by the Lessor in lieu of delay rental for a period of one year, at the end of which time, the Lessee shall resume the payment of delay rental or commence a second well. And the drilling of a second well, productive or otherwise, shall be full consideration to the Lessor for the grant hereby made to Lessee with exclusive right to drill one or more additional wells on the premises during the term of this lease.

The rents and royalties herein reserved shall include any rentals or royalties or interests in the oil and gas that may have been heretofore sold, reserved or conveyed by the Lessor or his predecessors in title. If Lessor does not have title to all the oil and gas under the above described premises, he agrees, on demand made, to refund the delay rental paid, or to refund and release from further payment the part thereof proportionate to the outstanding interest or title.

Lessor is to fully use and enjoy said premises for the purpose of tillage, except such parts as may be used by Lessee for the purpose aforesaid. Lessee is not to put down any wells on the land hereby leased within ten rods of the buildings now on said premises without the consent of the Lessor in writing. Nothing herein contained shall operate to prevent Lessee from removing its equipment and abandoning any well at any time.

The above rental shall be paid to Lessor in person or by check made payable to and deposited in the Post Office directed to The Nelson Land & Oil Company, Charleston, W. Va.

And it is further agreed that the Lessee shall have the right to surrender this lease at any time upon payment of one dollar and all amounts due hereunder, and thereafter shall be released and discharged from all payments, obligations, covenants and conditions herein contained, whereupon this lease shall be null and void; and that all conditions, terms and limitations between the parties hereto shall extend to their heirs, successors, personal representatives and assigns.

Also, on May 13, 1919, the taxpayer entered into a further agreement with the Carter Oil Co., the terms of which are as follows:

Memorandum of agreement made and entered into this 13th day of May, 1919, by and between The Nelson Land & Oil Company; a corporataion organized and existing under the laws of the State of Maryland, and lawfully doing business in the State of West Virginia, party of the first part, and The Carter Oil Company, a corporation, party of the second part:

Whereas, by deed bearing date the 29th day of April, 1919, the party of the first part has acquired from the Boone Coal Land Company certain rights and interests in five several tracts of land situate in Sherman District, Boone County, West Virginia, and containing respectively, ninety-two acres, sixty-five and one-half acres, ninety-five acres, five hundred and thirty-one acres, and seven hundred and ninety-four acres, and known as Tracts Nos. 1, 2, 3, 4 and 5 respectively; which said lands, or such of them as to which the party of the first part shall have a good and valid title, the party of the second part desires to lease for oil and gas purposes; and

Whereas, such leases for oil and gas purposes have been drawn, executed and acknowledged by said party of the first part, covering said five several tracts of land above referred to, and are now ready for delivery as soon as the title thereto is approved by attorneys of the second part:

Now, therefore, this agreement

Witnesseth: That the said parties hereto, in consideration of the premises, and in further consideration of the sum of One Dollar ($1.00) cash in hand paid by each of the said parties to the other, the receipt of which is hereby acknowledged, do hereby promise, covenant and agree with each other as follows:

First, that the said party of the second part shall pay to the party of the first part as a bonus for the leases aforesaid, the sum of Twenty Dollars ($20.00) per acre for all of said five tracts of land or so much thereof as the attorneys of the said party of the second part shall approve the title to the oil and gas underlying the same, except that in event said attorneys of the said second party shall not approve the title to either lot 1, 2 or 3, it shall not be bound to take the lease on either lot 4 or 5, but if the title shall be approved to any one of said lots 1, 2 or 3, said second party shall also take the leases on lots 4 and 5, provided the title to the same is approved by the attorneys of said second party.

It is hereby agreed that the five leases aforesaid, properly executed and acknowledged, shall be deposited with the Kanawha Banking & Trust Company of Charleston, West Virginia, and the party of the second part shall likewise deposit with said bank forthwith, an amount equal to the total bonus of Twenty Dollars ($20.00) per acre for all of the said five tracts of land, aggregating 1,577.5 acres; and said respective leases shall be delivered to the second party upon acceptance of title to any one or more of said tracts, and the payment of said bonus of Twenty Dollars ($20.00) per acre for such tract. The second party shall have thirty days in which to abstract title to said several tracts and check up the location thereof on the ground and to accept said leases.

All of said leases, the title of which shall be approved by the attorneys of the second party, shall be accepted and said bonus paid within thirty days, and in the event that the title to either lots 1, 2 or 3 shall be approved by the attorneys of said second party, the said second party shall have a reasonable time, after the expiration of said thirty days, within which to secure and make corrections in the titles to the lots, the title or titles to which are not approved, and so that the same may be approved and taken hereunder.

Second. In event that the title to the oil and gas underlying any of the said five tracts of land, or any part thereof, shall not be approved by the attorneys of the said second party within said thirty days, the bonus money deposited in bank as aforesaid, covering said acreage, shall be returned to the party of the second part, but in event of further time for correction of title under the last paragraph of section First the bonus money covering same shall remain in escrow under the terms and conditions hereof.

Third. It is further agreed that in the event said party of the second part shall accept said leases on tracts 1, 2, or 3 aforesaid, or any of them, or any part thereof, it will commence the drilling of a well thereon within sixty days from the date of delivery of the lease to it, and will drill the same to completion with due diligence, unavoidable accidents and delays alone excepted, and upon failure to commence such well within sixty days from date of delivery shall forfeit all rights of said party of the second part under said leases and each of them.

Fourth. It is further understood and agreed by and between the parties hereto that although said party of the second part by the terms and conditions of said leases has covenanted and agreed to pay a delay rental of One Dollar ($1.00) per acre per annum, payable each three months in advance, from November 13, 1919, that the drilling of a well by said party of the second part

on the lands described in said leases shall nevertheless stop the delay rental of Two Hundred (200) acres of land, and that the terms and conditions of said oil and gas leases, in event of the acceptance thereof by said party of the second part shall be modified by this agreement in that respect and to that extent.

Fifth. For further certainty there is hereto attached a map showing the general location of the five tracts herein referred to, as numbered 1, 2, 3, 4 and 5.

Sixth. The mutual covenants and considerations herein mentioned and expressed constitute the consideration of this agreement, and also part of the consideration for the execution of the five leases above mentioned, and are included in the "other good and valuable considerations" mentioned in said leases respectively; and said leases and this agreement shall be taken and read together as forming one entire contract, except that where a conflict may occur, the provisions hereof shall prevail.

Pursuant to the provisions of the foregoing agreement, the taxpayer received from the Carter Oil Co. within the year 1919, as a bonus of $20 per acre, the net sum of $19,879. The taxpayer included no part of this sum in income in its return for 1919, because of a belief that it constituted a return of capital and, therefore, was not subject to taxation. The amount in question was added to income for 1919 by the Commissioner for the reason, as stated in the deficiency letter of November 19, 1924, the "Information furnished regarding the sale of lease is incomplete and can not be accepted by this office [Commissioner's] in determining profit or loss on sale."

DECISION.

The determination of the Commissioner is approved.

OPINION.

MARQUETTE: The sole issue presented by this appeal is whether or not the amount of $19,879 received by this taxpayer in 1919 from the Carter Oil Co., as a bonus for the leases granted to that company by the taxpayer, constitutes taxable income, or a return of capital and not subject to taxation. As pointed out in our findings of fact, the amount in question was added to the taxpayer's net income by the Commissioner for lack of sufficient information upon which to determine to what extent, if any, this item was subject to taxation. But the issue comes before us on its merits, the parties to the issue entertaining diametrically opposed views.

The taxpayer contends that the five leases granted to the Carter Oil Co. under date of May 13, 1919, together with the agreement of even date, constituted, in substance as well as in fact, sales of the oil and gas in place; that mineral leases are in effect conveyances of mineral properties, because by operation under lease the subject matter of the lease is vacated, and, accordingly, the owner's right,

title, and interest in such properties acquired by deed for a definite consideration becomes exhausted; that the consideration under the lease becomes the purchase price of the subject matter of the lease; and that, before gain is determined by the disposition of property, there must be a return of capital outlay in the acquisition of such property. The taxpayer calls our attention to what it believes to be an apparent inconsistency on the part of the Commissioner in this matter with his view as otherwise expressed in article 215 of Regulations 45, which, so far as it is pertinent to the issue under consideration, reads as follows:

Art. 215. Depletion.—Adjustments of accounts based on bonus or advanced royalty.—(a) Where a lessor receives a bonus or other sum in addition to royalties, such bonus or other sum shall be regarded as *a return of capital to the lessor*, but only to the extent of the capital remaining to be recovered through depletion by the lessor at the date of lease. * * * (Italics ours.)

On the other hand, the Commissioner contends that the five leases and the supplemental agreement of May 13, 1919, conveyed no title to the oil and gas in place to the Carter Oil Co.; that the instruments in question merely conveyed to the Carter Oil Co. the right to enter upon the lands and explore for oil and gas; and that the taxpayer, so far as its capital was concerned, had divested itself of nothing, but, on the contrary, was in the same position immediately after granting the leases as it was before; hence, the amount of the bonus received from the Carter Oil Co. was taxable in full and can not be regarded as a return of capital.

The Commissioner further contends that article 215 of Regulations 45 is not applicable to the facts in this case, pointing out that the provisions of that article are limited to advance royalties and bonuses paid on oil and gas wells that are actually producing at the time of the granting of the leases.

We are unable to adopt the view vigorously pressed upon us in argument by counsel for the taxpayer that the instruments executed by it to the Carter Oil Co. are conveyances of the fee simple title to the oil and gas in place, and therefore that the transaction, of which these instruments are evidence, constituted, in fact and in substance, a sale of minerals. The instances in which absolute conveyances of oil and gas are made upon conditions requiring development for the mutual benefit of grantor and grantee are extremely rare, and it is to be presumed that the parties did not intend such a conveyance, unless the terms of the instruments so clearly indicate it that a contrary intention can not reasonably be deduced therefrom. *Toothman* v. *Courtney*, 62 W. Va. 167; 58 S. E. 915.

As is generally the custom in the drafting of oil and gas leases, the instruments we are considering here, in the granting part,

thereof, contain language generally regarded as appropriate and sufficient to accomplish the very thing which the taxpayer would have us regard as the substance of the transaction of which these instruments are the evidence. The leases set forth that the grantor "warrants specifically the title to all the oil and gas in and under, and grants, demises and leases, with covenants of quiet possession, and of sole right to convey * * *." But we find in these instruments other language which clearly discloses the limitations upon the grants. The language "to have and to hold unto and for the use of the lessee for the term of five years from the date hereof and as much longer as oil, gas or gasoline is produced in paying quantities," together with other provisions found in the instruments, reveals their real nature. The great weight to which this time limitation is entitled is augmented by that clause of the agreement of May 13, 1919, which by express provision is made part and parcel of the leases, which imposes upon the grantee, as a condition to the continuance of the estate, the payment of a yearly rental for delay in drilling a well; and the further clause in the leases yielding to the grantor the one-eighth part of the oil produced, delivered into tanks or pipe lines for the benefit of the grantor. These provisions are strongly indicative of a lease.

Though the words "demise" and "grant" embrace a fee, where they appear in instruments of the character of those here under consideration, their general significations are reduced and limited and they are used only to import to the agreements implied covenants on the part of the lessor of good right and title to make the leases, and an implied covenant of quiet enjoyment. In the case of *Toothman* v. *Courtney*, *supra*, the court had under consideration the contention that an instrument executed by Toothman was not a lease but a conveyance of the fee simple title to the oil and gas. The instrument there under consideration is strikingly similar to those in the case at bar, and, after reviewing carefully the language used, the court held:

In the granting part thereof it uses terms technically efficacious and appropriate for the accomplishment of such a result, and, if they were not limited and restrained by other language and provisions, the instrument could not be held to be a lease. Though words of absolute conveyance are used, the habendum limits them. * * * However long the term, an estate for years is not a freehold.

In the case of *Smith* v. *Root*, 66 W. Va. 633; 66 S. E. 1005, it appeared that one Hall and wife executed an oil and gas lease to Goff and Heck, bearing date of February 29, 1904, and the defendants claimed under a contract made by said Halls to one Thornily, dated June 27, 1905. The lease to Goff and Heck was to remain in force for 10 years, and as much longer as either oil or gas should be pro-

duced. Through various assignments this lease came into the possession of one Smith on February 6, 1906. Before this date, however, five quarterly rentals were past due and the Halls had refused an extension of time. In the meantime, and before the lease had come into the possession of Smith, the Halls had executed a second lease to Thornily. Smith brought suit to enjoin the defendants from operating on said land and from removing and disposing of the oil, and to have the second lease canceled as constituting a cloud upon his title. The lease, except for some unimportant variations in language, was practically identical with the leases here under consideration, and in the course of its opinion sustaining the decree of the lower court, which was adverse to the plaintiff, the court stated as follows:

> This contract, commonly called an oil and gas lease, did not invest Goff and Heck with any estate in the oil and gas in place; it simply gave them the exclusive right to make exploration upon this land for oil and gas. Their right was simply an inchoate right, not a vested estate in land. The lease is an executory contract in the nature of a license to enter upon the land and make exploration for oil and gas for a period of ten years, and longer if oil or gas should be discovered, and to extract them from the earth. No estate could vest until discovery.

Again, in the case of *Lowther Oil Co.* v. *Miller-Sibley Oil Co.*, 53 W. Va. 501; 44 S. E. 433, the same court held:

> An ordinary oil lease, making the lessee pay a consideration, binding him to some obligation, vests only an inchoate right—that is, right to explore for oil—but no actual other estate than right to develop; and, if he gets no oil, he still has no vested estate, but if he does get oil, he has a vested estate. Such a lease calls for the right, not to oil in place, but to extract it. *Steelsmith* v. *Gartlan*, 45 W. Va. 27, 29 S. E. 978; *Lowther Oil Co.* v. *Guffey*, 52 W. Va. 88, 43 S. E. 101; *Bryan on Petro. & Gas*, 174, citing *Venture Oil Co.* v. *Fretts*, 152 Pa. 451, 25 Atl. 732; *Colgan* v. *Oil Co.*, 194 Pa. 234, 45 Atl. 119.

That oil and gas in place may be made the subject matter of conveyance, so as to pass fee simple title thereto, seems fairly well established by all of the West Virginia cases cited above. See also *State* v. *Low*, 46 W. Va. 451; 33 S. E. 271; *Ohio Oil Co.* v. *Indiana*, 177 U. S. 190. But the intention of the parties to so convey title to oil and gas in place must be so clearly indicated by the terms of the instruments that a contrary intention can not reasonably be deduced therefrom. In the exposition of deeds the construction must be upon the view and comparison of the whole instrument, and with an endeavor to give every part of it meaning and effect. See Devlin on Deeds, section 837, and the long list of cases cited there.

Our conclusion is that the instruments under consideration are leases, vesting in the Carter Oil Co. only a right of exploration and production on the usual royalty terms, and that no estate was granted in the oil and gas in place.

Counsel for taxpayer in his brief devotes considerable argument to the proposition that the grants made under the leases constitute such a sale of rights as to bring the transaction, evidenced by the leases and agreement, within the scope of section 202 (a) of the Revenue Act of 1918, as a sale or other disposition of property, and that only the excess of the consideration received over the cost of the rights disposed of can be subjected to taxation. With this proposition we can not agree. So far as it relates to the sale or disposition of the rights pertaining to the oil and gas underlying the lands with respect to which the taxpayer acquired the fee simple title, we believe the proposition is disposed of by the decision of this Board in the *Appeal of William Robert Farmer*, 1 B. T. A. 711. Nor do we believe any different rule should be applied to the proposition as it relates to the rights to the oil and gas in place acquired by the taxpayer from the Boone Coal Land Co.

Taxpayer calls our attention to what it believes to be an apparent inconsistency in the Commissioner's action in the issue before us with his attitude as otherwise expressed in article 215 of Regulations 45, which provides that a bonus received by a lessor in addition to royalties, as a consideration for granting the lease, shall be regarded as a return of capital to the extent of the capital remaining to be recovered through depletion by the lessor. The inconsistency appears to us to be quite real. But, answers counsel for the Commissioner, " The article is applicable only to royalties and bonuses on oil and gas wells that are producing. Thus the ' bonus ' referred to in the article can have no application to rentals paid under leases to explore for oil and gas." Why the distinction, we are unable to comprehend; and that such distinction has not been the policy of the Commissioner in the past is apparent from examination of memorandum 3399 of the Solicitor of Internal Revenue, IV–1 C. B. 167, wherein the solicitor, after quoting article 215 of Regulations 62, identical with the same article of Regulations 45, stated: " The 'bonus or other sum in addition to royalties' mentioned in the above-quoted article is considered to be the price paid *for the right to explore for* and extract oil or mineral." (Italics ours.)

However, after a searching examination of the statutes, we are unable to find any statutory warrant which affords a sound basis for such distinction. Why a "bonus or other sum in addition to royalties" forming a part of the consideration for the lease should be regarded as a return of capital any more than the royalties is beyond our comprehension. It would be just as logical to hold that the royalties, to the extent of the capital remaining to be recovered by the lessor, constitute a return of capital. The method prescribed by the statute of returning to a corporate taxpayer its

capital investment, free from taxation, is through the depletion allowance provided for by section 234 (a) (9) of the Revenue Acts of 1918 and 1921. A bonus paid under such circumstances is as much a part of the consideration as the royalties. It is in fact and in substance a part of the royalties. Of particular interest in this connection is the decision of the United States Supreme Court in the case of *Work* v. *United States ex rel. Mosier*, 261 U. S. 352. This case reached the Supreme Court on a writ of error bringing up for review a judgment of the Court of Appeals of the District of Columbia, affirming a judgment of mandamus against the Secretary of the Interior commanding him to pay to the relators all the moneys due their minor children, members of the tribe of Osage Indians of Oklahoma, including their respective shares of bonus moneys paid the Secretary for oil leases made by the tribal council. Mr. Chief Justice Taft, in delivering the opinion of the court, said in part as follows:

Tho bonus which was the result of bidding for desirable and profitable oil and gas leases secured for the members of the Osage Tribe the just value of the use of their property which the fixing of royalties in advance by the President was not adapted to give them. It was in effect a supplement to the royalties already determined. It was really part of the royalty or rental in a lump sum or down payment. We do not see how it can be classified as anything else. It was income from the use of the mineral resources of the land. Of course, it involved a consumption and reduction of the mineral value of the land, but so does a royalty. This is an inevitable characteristic of income from the product of the mine.

True, the question before the court in the above case involved a construction of the Act of June 28, 1906, entitled, "An Act For the division of the lands and funds of the Osage Indians in Oklahoma Territory, and for other purposes," and the taxing statutes were not involved. But can there be any distinction in principle between the question there before the court and the question confronting us? On what possible theory could it be held that a bonus, forming a part of the consideration for a lease, is anything else than a part of the royalties? None suggests itself to our minds. In the case of the *United States* v. *Biwabik Mining Co.*, 247 U. S. 116, involving the question as to the right of the lessee, in computing its taxable net income, to take a deduction for depletion under the Act of August 5, 1909, the Supreme Court, in the course of its opinion, held that the sum paid by the defendant for the lease in addition to the royalties stipulated for therein " may properly and justly be considered a payment in advance of an increased royalty on ore to be mined * * *."

In view of the foregoing, we are of the opinion that sums in addition to royalties, paid by a lessee to a lessor as a bonus for the granting of a lease, constitute taxable income.